RUSSELL H. LINCOLN v. FRANKLIN SMITH, ELIJAH B. JONES, JOSEPH HUNTOON and TYLER G. FOSTER.

*Prohibition of sale of intoxicating liquor. Twelfth section of the law of 1852 to prevent traffic in intoxicating liquor for the purpose of drinking.*

The legislature have power to pass a law prohibiting the traffic in intoxicating liquor as a drink, and subjecting it to seizure, forfeiture, and destruction when kept for that purpose.

The provisions of the twelfth section of the law of 1852,* to prevent the traffic in intoxicating liquor for the purpose of drinking, so far as they relate to proceedings *in rem* to effect the forfeiture and destruction of liquors kept for illegal sale, are constitutional and valid. REDFIELD, CH. J. dissenting.

The apparent or alleged conflict between these provisions and those of the 1st, 9th, 10th, 11th and 12th articles of the bill of rights examined and explained or denied by BENNETT, J.

The 11th article of the bill of rights requires only that the place to be searched and the property to be seized should be described as nearly as may be; and such a description is intended and required by said twelfth section.

The description of the place as " the dwelling house of R. H. of Shrewsbury," is sufficiently certain, and imports that the house is in the town of Shrewsbury; and the description of the property as " intoxicating liquor" is a sufficiently particular designation of it.

The provision, that the owner or keeper of the liquor found shall be summoned, requires service by an attested copy of the complaint and warrant, as summons are ordinarily required to be served.

The legislature may provide that a probable cause for a prosecution shall be sufficient to overcome the presumption of innocence; and the finding of liquor by the officer as contemplated in said twelfth section furnishes evidence of a probable cause, if not *prima facie* evidence of an unlawful intent to sell.

The provision, in said section, for imposing a fine if, *in the opinion of the justice*, the liquor was kept for illegal sale, refers to a *judicial opinion* to be formed upon an examination and proof. BENNETT, J.

TRESPASS for breaking and entering the plaintiff's dwelling house, taking and carrying away certain liquors therefrom; assault and battery and false imprisonment. Plea, the general issue, with notice of justification, which set forth proceedings under the twelfth section of the law of 1852, to prevent the traffic in intoxicating liquor for the purpose of drinking; and that the defendant, Smith as constable of the town of Shrewsbury, and the other defendants, by

*Which are stated in full in the note upon p. 194 *ante.*

his request and as his assistants, performed the acts complained of in the service of a warrant issued in pursuance of said section. Trial by jury, September Term, 1854,—PIERPOINT, J., presiding.

Upon the trial the plaintiff introduced testimony tending to prove that at the time stated in the declaration, the defendant Smith, professing to act as constable of the town of Shrewsbury, in the execution of a warrant to search the dwelling house of the plaintiff for intoxicating liquors, entered the plaintiff's dwelling house, accompanied by the other defendants acting by his request and under his direction, and searched the house, and found there, and moved therefrom, one barrel of rum and eight barrels of cider; and that they subsequently destroyed the rum, but returned the cider.

The defendants, under their plea and notice, offered in evidence certified copies of the proceedings referred to in their notice, accompanied with evidence of the defendant Smith's official character, &c.; to the admission of which the plaintiff objected, and the court decided that they were inadmissible, and excluded them; to which the defendants excepted. The facts stated in the record, a copy of which was excluded, are sufficiently stated in the opinion of the court. The plaintiff claimed to recover the value of the rum and cider taken by the defendants. The defendants offered testimony tending to prove that the plaintiff was not a town agent for the sale of intoxicating liquors, and that he had no authority to sell the same for any purpose whatever; and requested the court to charge the jury that no action of any kind can be had or maintained in any court in this state, for the recovery or possession of intoxicating liquors or the value thereof, except such as are sold or purchased in accordance with the provisions of the act to prevent the traffic in intoxicating liquor for the purpose of drinking, approved November 23, 1852. The court declined so to charge, but did charge that the provision in the last clause of the 21st section of said act was applicable only to actions for the recovery of the value of liquors actually sold contrary to the provisions of said act; and that the plaintiff was entitled to recover the value of the rum taken by the defendants; to which decision of the court, their charge, and refusal to charge as requested, the defendants also excepted. The jury, under the charge of the court, returned a verdict for the plaintiff.

*E. Fisher, Jr.* and *C. L. Williams,* for the defendants.

*R. R. Thrall,* for the plaintiff.

The opinion of the court was delivered at the circuit session, in September, at Burlington, in the third judicial circuit, by

BENNETT, J. This is an action of trespass in five counts. The first count charges the defendants with breaking and entering the dwelling house of the plaintiff, situate in the town of Shrewsbury. The second count charges the taking and carrying away of certain goods and chattels of the plaintiff, viz, certain liquors ; and the three other counts charge in each, an assault and battery, adding other matter by way of aggravation ; no evidence was given under these counts.

The defendants plead the general issue, and certain special matter by way of notice, in justification of the charges in the declaration, which notice may be referred to.

The plaintiff, it seems, gave testimony tending to prove that the defendant Smith, a constable of Shrewsbury, professing to act under a warrant, to search the dwelling house of the plaintiff, for intoxicating liquors, entered the same, accompanied by the other defendants, as his assistants, and made search, and having found in the house one barrel of rum and eight barrels of cider, he took the same and carried them away.

The court below precluded the defendants from going into proof of their justification, and excluded the certified copies of the records and proceedings referred to in their notice, which copies are made a part of the case. It is upon the validity of this justification, we are to pass ; and it must be admitted that the questions arising in the case are important, and not free from difficulty. It will be well first to understand with precision what facts appear from the records. Three of the legal voters of the town of Shrewsbury made complaint in writing, to a justice of the peace within and for the county of Rutland, stating "that they had reason to believe and did believe, that intoxicating liquors were kept, or deposited in the dwelling house of Russell H. Lincoln, of Shrewsbury, in the county of Rutland, and intended for sale, contrary to the form of the statute in such case made and provided and against

the peace and dignity of the state;" and the same was by them duly sworn to before said justice, on its being presented to him. Upon this the justice issued his warrant, directed to any sheriff or constable in the state, commanding them "to search the premises described in the foregoing complaint, and if any intoxicating liquor should be found therein, under circumstances warranting the belief, that it was intended for sale, contrary to the provisions of the act of November 23d, 1852, to prevent the traffic in intoxicating liquor for the purpose of drinking, to seize the same," &c. The warrant then commands the officer to summon the said Russell H. Lincoln to appear, forthwith, before the said justice, at the office of Ebenezer Fisher, Jr., in said Shrewbury, to show cause, &c.

The officer's return shows, that in obedience to said warrant, he searched the dwelling house of the said Russell H. Lincoln, and found therein one barrel of rum and eight barrels of cider, under such circumstances, as warranted the belief that the same was kept for sale; that he seized the same and had it in safe keeping, and that said Lincoln being the owner of the rum and cider, he made service upon him by giving him a true and attested copy of the summons, complaint and warrant.

The record of the justice shows, that upon the return of the complaint, warrant and summons to him, the said Lincoln, in obedience to the same, appeared before him, and being called upon, he failed and neglected to show, that the said liquor was not intended for sale, &c. The record then proceeds, " and it being shown and proved to the satisfaction of said justice, that the one barrel of rum described in said return, was and is intended for sale by the said Lincoln, contrary to the provisions of said act, it was adjudged forfeited, and ordered to be destroyed," &c. The record then shows the issuing of the order of the justice for the destruction of the liquor, and the return of the officer showing the order complied with, and the record then proceeds, " and it being shown and found to the satisfaction of said justice, as above stated, it is the opinion of the said justice, that the said barrel of rum was kept by the said Lincoln and deposited in his said dwelling house for the purpose of sale, and to be sold by him contrary to the provisions of said act; and therefore he is adjudged and sentenced to pay a fine of $20," &c.

The cider was adjudged not to be forfeited, and was ordered to be restored to the owner. The justification set up by the defendants in their notice, involves both the validity of the law, under which the proceedings were had, and also the validity of the proceedings themselves, and it may not be amiss to refer somewhat in detail to the different sections of the statute, upon which the justification must rest. The first section contains a general prohibition against the manufacture, sale, furnishing or giving away any intoxicating liquor, with an exception thereafter provided for, that it may be sold to be used for medicinal, chemical and mechanical purposes only. The fifth section gives a penalty for the sale, furnishing and giving away any intoxicating liquor in violation of the act; and the ninth section gives a penalty, when a person becomes a manufacturer, or common seller of intoxicating liquors, without having been appointed town agent, to sell them for medicinal, chemical and mechanical purposes, as provided for in the act. The twelfth section which provides for the seizure and forfeiture of the liquors intended for sale, in violation of the provisions of the act, and for inflicting a penalty on the owner, seems to have been framed in an eminent degree for the purpose of carrying out fully the general provisions of the law, and preventing infractions of it. The thirteenth section provides for giving notice, in cases where the owner, keeper or possessor of any liquor seized, under the twelfth section, is unknown to the officer making the service, by posting up in some public place a written notice, for at least two weeks before said liquor can be proceeded with, under said twelfth section. The fourteenth section secures to the claimant of such liquors an appeal from the judgment of the said justice to the county court upon his giving a bond with good and sufficient sureties in the sum of $200, conditioned that he prosecute his appeal to effect and pay all fines, forfeitures and costs, which may be finally awarded against him. The eighteenth section prescribes what shall be the form of the complaints for offences against the different sections of the act; and the twenty-first section declares, that all payments or compensations for liquor sold in violation of the law, whether in money, labor or personal property, shall be held and considered to have been received in violation of law, without consideration, and against equity and good conscience, and that no action of any kind shall be

had or maintained in any court in this state for the recovery or possession of intoxicating liquors, or the value thereof, except such as are sold, or purchased in accordance with the provisions of the act. These are all the sections of the act bearing on the subject of the seizure and condemnation of intoxicating liquors kept for sale in violation of the act; and it seems necessary they should be brought to view, in order that we may have a fuller and better understanding of the legal and constitutional character of the different provisions of the act, and of the proceedings under it, as disclosed in the case now before us.

Before proceeding further in the examination of the case, it may be remarked that the act in question is somewhat loosely drawn; and it may doubtless require some good degree of intelligence, and sound legal discretion in settling the details of procedure under it; but perhaps not more, than what frequently, and almost unavoidaably happens, where a course of proceedings not known at the common law, is newly instituted. It may be further remarked, that the court should use the utmost circumspection, in declaring an act of the legislature void; and the supreme court of the United States have said in more instances than one, that in no doubtful case, would they pronounce a legislative act of one of the states to be contrary to the constitution; and this has been declared to be the rule upon which courts will act, almost as often, as questions of constitutional law have been drawn into debate. If, however, the court could see, that the act in question was an obvious violation of the fundamental principles of constitutional law, it would be their duty so to declare, however irksome the task might be, and I trust they would have no disposition to shrink from its performance.

It may be further remarked, that every reasonable intendment, is to be made in favor of the constitutionality of a law; it being an act of the coordinate branch of the government. It may also be remarked, that though the rule is, that penal statutes are to be construed strictly, yet it is to be taken with this qualification, that they are not to be construed so strictly, as to defeat the obvious intention of the legislature. This qualification is as well settled, as the rule itself, and has been fully recognized and acted upon in our American courts.

In the case of *Pike* v. *Jenkins*, 12 N. Hamp. 255, the court say, "it has been held that courts are not to narrow the construction of penal statutes, but are to give effect as near as may be, to the plain meaning of words; and where they are doubtful they are to adopt the sense, that best harmonizes with the context and the apparent policy and object of the legislature;" and in relation to a certain class of penal statutes, it has been well said, that there is a higher rule of construction, than the general one, that they are to be construed strictly; and that is, that all statutes which are made *pro bono publico*, shall be expounded in such a manner, that they may as far as possible, attain their end. This is no new qualification of the general rule. In the days of Viner, the rule is laid down by him thus: "The rule that penal statutes must be construed strictly may be adopted with this qualification, that it does not apply to those cases, where the object of the statute was to prevent a general mischief, although it may be held good in cases where laws are penal, as to particular persons, but not if made for the public good, and the peace and safety of the realm." 19 Viner, 521, and in Vaughn, 179, the rule is also recognized, "that statutes, which are made for the public good, are to be so expounded as to attain their end."

In *Heyden's* case, 8 Coke's Rep. 7, the resolutions of the Barons of the Exchequer, "for the sure and true interpretation of all statutes in general, be they penal or beneficial or restrictive or enlarging the common law, show that four things are to be discerned and considered," the last of which is "the true reason of the remedy." And it was there held "to be the duty of the judges at all times to make such construction as should suppress the mischief, and advance the remedy; putting down all subtle inventions and evasions for the continuance of the mischief, *pro privato commodo*, and adding force and life to the cure and remedy, according to the intent of the makers of it, *pro bono publico*." That the statute of 1852, the primary object and end of which was to suppress and put an end to the evils of intemperance, which all admit are great, is a law made *pro bono publico*, will not, I apprehend, be questioned, although many may differ from the legislature, as to the expediency of the law. The very nature of the case bespeaks it, in a preeminent degree, to have been an act designed by the law making power, for

the public good. Having premised thus much, we are prepared better to enter upon the main questions in the case, and we are met at the threshold with the question, whether it is competent for the legislature to pass a law prohibiting the traffic in intoxicating liquors as a drink. Had it not been for some recent speculations on the subject we should have hardly considered this as a debate-able ground. But since the question has been of late somewhat mooted, it may not be amiss to give it a passing notice. We appre-hend, there is no good ground to claim that the act, now under con-sideration, is a violation of any of the provisions of the constitution of the United States, applicable to and binding upon state sove-reignty. It does not in terms, or in its operation, profess to pro-hibit the sale of imported liquors, by the importer, while they remain in the original casks in which they were imported, in quantities not less than the laws of congress prescribe.

Though congress has the sole and exclusive power to regulate commerce with foreign nations, and between states; yet that power is not infringed upon by the enactment of the law in question. It does not operate upon the sale of liquors of foreign importation, so long as they remain articles of foreign commerce. They must first become a component part of the general property of the state, and be subject to state legislation. In the license cases which went to the supreme court of the United States from Massachusetts, Rhode Island and New Hampshire, 5 Howard, 504, it was fully settled that those laws were no infraction of the constitution of the United States. Several of the judges expressed a decided opinion, (and no one to the contrary,) that if a state legislature had the power of restraint to any extent, it must follow that it had the discre-tionary power to fix the line of such restraint; and might go the length of prohibition, if thought wise to go to that extent. The New Hampshire act prohibited all sales of intoxicating liquors, without a license first had for such purpose; and the granting a license was discretionary. The fact that a license was necessary, presupposes a prohibition to sell in all who had not obtained a license; and if a license should be refused, the prohibition in effect became absolute. Justice GRIER, in the cases referred to, says, " the true question presented by the cases, and one which he was not disposed to evade, was, whether the states had a right to pro-

hibit the sale and consumption of an article of commerce, which they believe to be pernicious in its effect, and the cause of disease, pauperism and crime." Judge CATRON treats it as inevitable, that if a state has the power of restraint by license to any extent, she may go the length of prohibition if such is her policy. CH. J. TANEY and Justice WOODBURY, go the same length; and Justice NELSON is said to have coincided in the opinion delivered by Justice CATRON and the chief justice. Though none of the statutes then before the court, were absolute in their terms of prohibition; yet the opinions are not to be regarded as mere *obiter dicta*, since the question was fully argued by counsel opposed to the validity of the laws, and the position taken by them was, that a license might be refused, and if refused the act would in effect become a prohition and prevent importations, as importations would only be made to sell, and in this way, the laws, it was said, would be unconstitutional. What was said by the judges, as to the right of prohibition, was by way of answer to the position taken by counsel, which may have been sound, unless what was said by the judges, as to the extent to which a state might go, was a good answer.

The tenth article, to the amendment of the constitution of the United States, expressly declares, "that the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people."

It may then be laid down, as a general rule, that the limitations on powers contained in the United States constitution, when expressed in general terms, are naturally and necessarily applicable to the government created by that instrument, and have no application to the legislative powers of state governments. The reason of the rule is, that the constitution of the United States was ordained and established by the people of the United States, for themselves, and for their own government, and not for the government of the states. *Barron* v. *The Mayor and City Council of Baltimore*, 7 Peters, 243. Upon this principle it has been held, that the article relative to a right of trial by jury in civil cases, and the one securing persons, houses, &c., against unreasonable search and seizure, do not apply to state governments; but restrict only the government and officers of the United States, and proceedings in the federal courts. See

*Livingston* v. *Mayor, &c. of the City of New York*, 8 Wend. 100. *Colt* v. *Eves*, 12 Conn. 243. *Reed* v. *Rice*, 2 J. J. Marshall, 45. The same has been held as to the article, which secures " to the accused a trial by jury in all criminal prosecutions." *Murphy* v. *The People*, 2 Cowen, 815. *Yorkson* v. *Wood*, 2 Cowen, 819. We apprehend that there is no provision in the constitution of the United States, which it can be claimed is in any way encroached upon .by the act of our legislature, now under consideration.

The fifth article in the bill of rights, in our state constitution declares " that the people of this state, by their legal representatives, have the sole, inherent and exclusive right of governing and regulating the internal police of the same." We cannot doubt that the law in question falls within that large class of powers, which are essential to the regulation, promotion, and preservation of the morals, health and the general well being and prosperity of the people of this state; and that it may in an eminent degree be regarded as a police regulation, as much so as laws restraining the sale of diseased provisions, or the quarantine laws, which restrain the natural liberty of the subject, and authorize the destruction of his property, which may be supposed to be infected with contagious disease.

Though the act of our legislature is entitled an act " to prevent the traffic in intoxicating liquors for the purpose of drinking," yet the primary object and end of the law is the prevention of intemperance, pauperism and crime; and the prohibition of the traffic, is but the medium through which the object and end of the law is to be obtained. If it be once granted, that the use of intoxicating liquors as a drink is worse than useless, and intemperance a legitimate consequence of such use, and that intemperance is an evil, injurious to health and sound morals, and productive of pauperism and crime; it seems to us, that a law designed to prevent such consequences must clearly fall within the class of laws, denominated police regulations. The legislature in passing the law in question doubtless supposed, that the traffic and drinking of intoxicating liquors went hand in hand, and that they were even more than twin sisters, that they were not only born together, but that they would also die together, and that by cutting off the one, the other would also fall with it. Whether the drinking of intoxicat-

23

ing liquor tends to produce intemperance, and whether intemperance is a gangrene, tending to corrupt the moral health of the body politic, and to produce misery and lamentation; and whether the law in question is well calculated to cut off, or mitigate the evils supposed to flow directly from intemperance, and indirectly from the traffic in intoxicating liquors, were questions to be settled by the law-making power; and their decision in this respect is final, and not to be reviewed by us. It is clear the legislature assumed all this, in the passage of the law in question; and, in our passing upon its validity, we are not to assume the contrary. If the legislature has no power to pass a prohibitory law, there is an end of the question, and the judgment below should be affirmed. It has been said that intoxicating liquors are property, and that a law prohibiting their sale, as a drink is the exercise of a despotic power, calling for a constitutional interference with the rights of property, and necessarily impairing and even destroying those rights, which, it is claimed is against natural right and justice, and beyond the pale of constitutional authority. It is not to be assumed by us, that intoxicating liquors under the act, are not to be regarded as property, at least in a certain sense. The act does not declare that they are not property, and there is no language which should receive a construction to forbid their being property. Though there is a prohibition not to sell them; yet that cannot prevent a man from having a property in them for his own use, without any intention to sell them; and they may be transported through the state, where there is no intention to violate the law; and indeed the act itself authorizing the town agents to sell them for certain specified purposes, thereby admits them to be property for such purposes. But treating them as property, at least until condemnation, the inquiry is, what should be the result? If the law does not contravene some of the provisions of the constitution, I apprehend it will be in vain to attempt to make out, that it is void, as being contrary to the principles of natural justice.

Men's ideas of natural justice are not bounded by any fixed standard, and the ablest men, and purest minds differ very much upon the subject. It has been claimed by high authority, that the power of a state legislature to enact laws, is limited only by the constitution of the state, or some provision of the United States

constitution, and that courts ought not to, and do not possess the power to annul and set aside any law solemnly passed; simply upon the assumed ground of its being contrary to the principles of natural justice. Others have held that, from the nature of society and government, limits are prescribed to legislative powers, and that an act clearly against the principles of natural justice is void, and may be so declared by courts. But be this as it may, we apprehend, it would be assuming too much, to say that the act in question was passed in the exercise of a power, irrespective of the original purpose of the social compact; and that it is in any way subversive of its object and design; and indeed, the very object of the law was to carry out the original purpose of the social compact, the promotion of the greatest public good.

But it is said, that the right of private property is founded in the laws of nature, and that a statute taking away the use and disposal of a man's own acquisitions, is in violation of his own natural right of property. To this we answer: when men enter into the social compact, they give up a part of their natural rights, and consent that they shall be so far restrained in the enjoyment of them by the laws of society, as is necessary and expedient for the general advantage of the public. 1 Blac. Comm. 125, and on page 138 the same writer says : " The third absolute right is that of property, which consists in the free use, enjoyment and disposal of all a man's acquisitions without any control or diminution, save only by the laws of the land." This then is what is meant by a right of property, under civil government; and the question then comes to this, is the law under consideration valid, as a law of the state ? If it is not, it must be, because it is at variance with our state constitution. It may in this connection be well to refer to the different provisions in the constitution, which may be supposed to have a bearing on the validity of the law ; and then inquire if any of those provisions have been violated in the principles of the law, or its details; so far as drawn in question in the case now before us.

The first article in our bill of rights declares, that " all men are born equally free and independent; and have certain, natural, inherent and inalienable rights, amongst which are the enjoying life and liberty, and acquiring, possessing and protecting property,"

The fourth article declares that every person within this state, ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs, which he may receive in his person, property or character; he ought to obtain right and justice freely, and without being obliged to purchase it, completely and without any denial, promptly and without delay, conformably to the law." The ninth article declares " that every member of society hath a right to be protected in the enjoyment of life, liberty and property. The tenth article declares " that in all prosecutions for criminal offences, a person has a right to be heard by himself and his counsel; to demand the nature and cause of his accusation ; to be confronted with the witnesses; to call for evidence in his favor, and a speedy public trial by an impartial jury of his country; without the unanimous consent of which jury, he cannot be found guilty ; nor can he be compelled to give evidence against himself; nor can any person be justly deprived of his liberty; except by the laws of the land, or the judgment of his peers." The eleventh article declares, "that the people have a right to hold themselves, their houses, papers and possessions, free from search or seizure; and therefore warrants without oath or affirmation first made, affording sufficient foundation for them, and whereby an officer or messenger may be commanded or required to search such suspected places, or to seize any person or persons, his, her, or their property, not particularly described, are contrary to that right and ought not to be granted. The twelfth article declares, " that when an issue in fact, proper for the cognizance of a jury, is joined in a court of law, the parties have a right to trial by jury, which ought to be held sacred." I am not aware of any other provision in our state constitution, which any one could claim has a bearing upon the law. We do not well see, how it can be claimed that the act in question is a violation of the first article in our bill of rights, unless it be first assumed that the law is invalid, which is the very thing in dispute. This article declares that all men have certain, natural, inherent and inalienable rights, among which is the enjoying and defending of life and liberty, and of acquiring, possessing and protecting property. This article seems to be a recitation of some of the natural rights of men before entering into the social compact. But these rights may be controlled or modified by the laws of the land. In the lan-

guage of Judge BLACKSTONE, "they are absolute and inherent rights without any control, or diminution; save only by the laws of the land." It might as well be claimed, that the law punishing murder with death, or the laws restraining the liberty of the subject for any of the lesser offences, are violations of this article in the bill of rights, as the act in question provided, in other respects it is a valid law. The right to life, liberty and property are all placed in the same connection; and certainly the two former are as sacred as the latter; although they have not seemed at all times to have called out the same legal acumen in their behalf, as the latter. The fourth article secures to every person in the state, " a certain remedy, by having recourse to the laws, for all injuries or wrongs, to person, property or character, and he is entitled to obtain right and justice freely, and not be obliged to purchase it, completely and without any denial, promptly and without delay, conformably to the law." Going upon the ground that intoxicating liquors are property, and such the act itself seems to recognize them to be, at least until they have been judicially adjudged to be forfeited, and ordered to be destroyed; it may be somewhat difficult to see how the latter clause in the twenty-first section of the act can be reconciled with the rights secured by the fourth article of our bill of rights, That clause is, "and no action of any kind shall be had or maintained in any court in this state, for the recovery or possession of intoxicating liquors, or the value thereof; except such as are sold or purchased in accordance with the provisions of the act." If no action can be had for the recovery of intoxicating liquors, or for the value of them, against a *tort feasor*, it would seem as if the law must necessarily presume a want of right to them. The court below when called upon to direct the jury, that this action could not be maintained under this section of the statute, held that this section was applicable only to actions brought to recover the value of liquors actually sold contrary to the provisions of the act. We do not find it necessary to decide what should be the true construction of this clause in the twenty-first section; nor to inquire into its incompatibility with the fourth article in our bill of rights; or with that clause in the United States constitution, which denies to the states the power to pass laws impairing the obligation of contracts. It will be time enough

to decide these questions, when found necessary. I am not aware that it can be claimed that any other portions of the law now in question, can be in conflict with the fourth article in the consitution. The ninth article resolves, "that every member of society has a right to be protected in the enjoyment of life, liberty and property." But how protected? The answer is; according to the standing laws. The question, then, under this article is, what is the character of the act before us? Does it possess the force and vitality of a law? Neither the first nor the ninth article in our bill of rights should be so construed as to trammel the legislature in passing such laws as they shall deem the public good requires; although such laws may act upon and abridge the natural rights of persons before entering into the social compact. It may be necessary to examine somewhat at length, the twelfth section of the act, and see upon what principles it is based; and also the details of that section, that we may the better determine whether its principles or its details contravene any of the provisions in our state constitution. But in the first place, was it competent for the legislature to give the right of search and seizure, and also a forfeiture and destruction of intoxicating liquors, kept for sale contrary to the provisions of the act. This was assumed by the legislature. The sole inherent and exclusive right of regulating and governing the internal police of the state, is given expressly to their representatives. The power of the legislature is then ample to pass the twelfth section, unless restrained by some constitutional provision. As to the right of search and seizure, the language of our constitution is, " the people have a right to hold themselves, their houses, papers and possessions, free from search or seizure, and therefore warrants without oath, affirmation, &c., are contrary to that right; and ought not to be granted." The language of the constitution of the United States secures against unreasonable searches and seizures, and I apprehend it will not be claimed that the construction of ours should be different, from what it should be, if the word "unreasonable," had not been omitted.

It is no new thing to extend the police power of a state to the search, seizure, and destruction of property; and when this principle is attempted to be applied to intoxicating liquors, I apprehend much of the opposition has its source in a settled conviction, that

this species of property is not of that character, which ought to be subjected to the application of such a principle; which, as it seems to us, is purely a question with the law making power. Nuisances may be abated in the most summary manner; dogs found chasing sheep may be shot down; bucks running at large within a given period, without the marks of the initials of the owner's name, may become the property of the captor; and race horses may be declared forfeited; gambling implements may be destroyed; lottery tickets and obscene prints may be prohibited, and under the quarantine laws, the health officer of a city, to prevent the spread of infection or contagion, may destroy bedding or clothing, or any part of the cargo of a vessel, subject to quarantine, and which " he may deem infected." Gunpowder kept in improper places, may be seized and confiscated; and the exercise of these powers, is a power of prevention, highly conservative in its character, and essential to the well being of the body politic, and ought not to be characterized as arbitrary or despotic. So the twelfth section of the act under consideration is eminently preventive in its provisions; as well as remedial in its character. The power to seize and confiscate private property for the violation of municipal laws, and as a means of preventing infractions thereof, has long been exercised by the general government; and I am not aware that the existence of that power has ever been denied; and it is a familiar principle that the long exercise of a power by a government, without objection, furnishes the strongest if not conclusive evidence that it was rightfully exercised. It need not be remarked that the general government in this respect cannot transcend the powers of a state sovereignty, within its own territory. The United States rely in a great degree, for revenue, on duties levied on imported merchandise; and to secure their payment, certain prescribed forms are to be observed by the importer, and if these forms are not observed, no matter from what cause, his goods, and in some instances, the vessel or vehicle, in which they are brought into the country, are subject to seizure and forfeiture. The collector of customs has power given him by congress to enter any ships, &c., where he suspects dutiable goods are concealed, and search for them; and if found, seize them; and if he suspects they are concealed in a dwelling house, he may have a warrant to search such dwelling house, &c.

Under the act, "to interdict the commercial intercourse between the United States and Great Britain and France and their dependencies," a similar power was given to seize contraband goods; and to enter any ship or vessel, dwelling house, store, building, or other place, to search for, and seize such goods; and the power is declared to be the same, as was given in relation to dutiable goods; under the act of 1799. In the case of *Sallee* v. *Smith*, 11 Johnson, 500, it was held the collector, in an action of trespass, might justify under the act; and might seize goods standing in a sleigh in an open shed without warrant; and it was fully conceded by the court, that with a warrant he might enter and search a dwelling house. Under the act of congress of February 4th, 1815, entitled "An act to prohibit intercourse with the enemy," similar powers are given to the custom-house officers. In the act of congress, passed in 1834, entitled "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers;" the principles of seizure, forfeiture, and the destruction of intoxicating liquors, carried into the Indian country against the provisions of that act, are put forth in all their vigor. The act among other things, declares, "if any superintendent of Indian affairs, &c., has "reason to suspect, or is informed, that any white person, or Indian "is about to introduce, or has introduced any spirituous liquor, or "wine into the Indian country, in violation of the provisions of this "section, (20th section,) it shall be lawful for such superintendent, "&c., agreeably to such regulations, as may be established, by the "President of the United States, to cause the boats, stores, pack- "ages, and places of deposit of such person to be searched; and if "any spirituous liquor or wine is found, the goods, boats, packages, "and peltries of such persons, shall be seized and delivered to the "proper officer and shall be proceeded against by libel in the "proper court, and forfeited." This section concludes thus, "and "it shall moreover be lawful for any person in the service of the "United States, or for any Indian, to take and destroy any ardent "spirits or wine found in the Indian country, excepting military "supplies as mentioned in this section."

The conservative powers of the government are also put forth in an eminent degree in the twenty-first section of this act, which, after prohibiting the setting up, or continuing any distillery for manufacturing ardent spirits in the Indian country, under certain enal-

ties, makes it the duty of the superintendent of Indian affairs, &c., if any are set up or continued, forthwith to destroy and break up the same ; and the United States troops may be employed in executing that duty.   Here is a prohibition against a person engaging in a particular business, under certain penalties ; and if he violates the law, authority is given to destroy his property employed in such prohibited business, in the most summary manner, and without process.   We may with much propriety, apply to the action of the general government, the remarks of the supreme court, as applied to a state goverment, in the case of *Briscoe* v. *Commonwealth Bank,* 11 Peters, 257 ; where they say, " a uniform course of action, invol-" ving the right to the exercise of an important power by the state " goverment for half a century, and this almost without a question, " is no unsatisfactory evidence, that the power is rightfully exer-" cised."

Shall it be said that the arm of our state government is too feeble and too short to relieve itself against the evils of intemperance ? And this too, by a prohibition of the traffic in intoxicating liquors, superadding the right of search, seizure and destruction of the property designed to be used in the violation of the act ?   It seems in relation to our Indian territory, congress thought it right and wise to go that length, " to preserve peace on our frontiers !"   The exercise of such a power may be deemed essential to self preservation ; and we may ask how a state legislature can be sovereign within its respective sphere, and not have the power of regulating all its internal police, saying what traffic she will esteem prejudicial to the public good, and what not ?   What she will prohibit *pro bono publico,* and what not ?   Power to destroy articles of property, as under the law of congress relating to the Indian country, or under the quarantine laws, where goods are supposed to be infected with some contagious disease, involves a power to prohibit a traffic in them.   The power to destroy is the greater power, and may well be said to contain the lesser ; and if a legisture be competent to direct the destruction of property without judicial process, they may do it under it.   And it may well be inquired, which is the more important and vital to the well being of the body politic, to prevent the spread of a contagious disease which affects the body, or the spread of a moral contagion,

which results indirectly from the traffic, and more directly from the unrestrained use of intoxicating liquors?

If then, the legislature have the power to pass a law to prohibit the domestic traffic in intoxicating liquors, and to subject them to seizure, forfeiture and destruction, it becomes necessary to inquire whether there is anything in the details prescribed, in the law itself, to be pursued for the purpose of obtaining a forfeiture and destruction of the liquor, or any defect in the proceedings themselves in the present case, as not being conformably to the law itself, which shall defeat the defendants of the benefit of their justification?

I have before said, that the construction of the eleventh article of our bill of rights is to secure only against unreasonable searches and seizures, and the question is, does the act, in terms, authorize unreasonable searches and seizures, so as to violate the provisions of the constitution? Or are the complaint and warrant to make the search and seizure, so defective in point of fact, as not to justify any proceedings under them? It seems necessary that we first should have a clear and precise understanding of what is meant in the eye of the law, by unreasonable searches and seizures, and of the characteristics which will render them obnoxious to this constitutional provision. This article in the constitution is directed against the use of general warrants; and it is the searches and seizures under such warrants, which are pronounced unreasonable. It was claimed in England up to the sixth year of the reign of GEORGE III, that at the common law, general warrants were valid, and such was the resolution of the twelve judges of the time of CHARLES II and JAMES II. See 3 vol. State Trials, 53 : the trial of *Carr* for a libel. And certain it is that it had been the practice to issue general warrants up to the sixth year of the reign of GEORGE III, when they were adjudged to be illegal, both in the court of common pleas and the kings bench. See *Entick* v. *Carrington*, 2 Wilson, 275, and *Money et al.* v. *Leach*, 3 Burrow, 1766.

This controversy in England in relation to the validity of general warrants was well understood by the framers of our state and United States constitutions. It is evident from the language used that the provision to secure against unreasonable search and seizure was pointed against general warrants, which had been condemned in England.

Lincoln *v.* Smith et al.

The language in some of the state constitutions is, " No warrant to search any place, or to seize any person or things shall issue without describing them, as particularly as may be ; nor then, unless there be probable cause, supported by oath or affirmation." Though the language in our bill of rights is less condensed, yet it amounts to the same thing. It prohibits the issuing of warrants, when the places, the persons or things, " are not particularly described." But this is to have a sensible construction, and they should be described, " as nearly as may be," in the language of quite a number of the state constitutions ; and this is all that ours should require ; although the degree of particularity in the designation, which should be required, should vary in some sense with circumstances. The questions then are, does our statute of 1852, require the place, and the thing to be searched for, to be designated with sufficient certainty, to answer the requirements of the constitution ? And does the warrant itself contain the requisite degree of certainty ? Neither the statute, or the warrant profess to give the right to apprehend the body of any one. They are directed solely against the place and the thing to be searched for, and that part of the article in the bill of rights relative to the security of the person, is out of the case. The language of the statute is, " If any three per-" sons, voters in any town, shall make complaint under oath or " affirmation before any justice of the peace in the county, that " they have reason to believe and do believe, that intoxicating " liquor is kept or deposited in any dwelling house, store, shop, " steamboat or water craft of any kind, depot, railroad car, or land " carriage of any kind, warehouse or other building or place in said " town and intended for sale, by any person not authorized to sell " the same, the said justice of the peace shall issue a warrant to any " sheriff or constable of the state, to search the premises, described " in such complaint ; and if any intoxicating liquor is found there-" in, under circumstances warranting the belief, that it is intended " for sale contrary to the provisions of this act, such officer shall " seize the same," &c.

The language of this part of the act is somewhat loose ; but it is not difficult to see the intention of the legislature, and had the phraseology been, " that they, (the complainants) have good reason to believe, and do believe that intoxicating liquor is kept or depos-

ited in some dwelling house, store," &c., "in said town," and intended for sale by some one, not authorized to sell the same, it would have been more direct; still the meaning would have been the same. This is surely what the legislature mean, in saying in any dwelling house, store, &c., and it is intended that the place where the liquors were deposited should be particularly described in the complaint. This appears from the direction given to the justice. "He shall issue a warrant to any sheriff, to search the premises described in such complaint; and the same appears from the form given in the eighteenth section for the complaint, which is, "they have reason to believe," &c., "that intoxicating liquor is kept or deposited in, (describing the place where,) and intended for sale, contrary to the form," &c.

This portion of the statute is remedial, and we should construe it liberally. A penal statute may, sometimes, also be a remedial law; and it may be penal in one part, and remedial in another. We think then, that this section does not profess to empower the justice to issue what is termed a general warrant, as to the place to be searched. In the complaint, the place where the liquor was alleged to be deposited, was "in the dwelling house of Russell H. Lincoln, of Shrewsbury, in the county of Rutland."

We apprehend it cannot be claimed, that the place to be searched is not described with sufficient certainty in the complaint. A dwelling house is defined to be "the house in which one lives." Lincoln is alleged to be of Shrewsbury, &c., that is, living in Shrewsbury, and it follows from what is alleged, that his dwelling house must be situate in the town of Shrewsbury. He could not live in that town, and at the same time have his dwelling house in another, neither is it to be intended that he had two dwelling houses at one and the same time, in the same town. In the case of the *Commonwealth* v. *Dana*, 2 Met, 329, it was held, that the place to be searched was well designated in a search warrant by denominating it the office of D., and truly stating the number of it, and the street in which it was situate, although A. and D. occupied the office together.

The complaint is attached to the warrant, and the command is "to search the premises described in the foregoing complaint." This makes the complaint a part of the warrant, and there need be

no further designation in the warrant, when the designation in the complaint is sufficient. See 2 Metcalf, 320. Besides the law itself says the warrant shall issue to search the premises described in the complaint.

It becomes necessary to inquire whether the thing to be searched for is described with sufficient certainty. In the cases from 2 Wilson, 275, and 3 Burrow, 1766, the warrants were of the most general terms. In the one case it was to apprehend the body of the plaintiff and to search for and seize his books and papers ; in the other, it was to search for and seize the authors, printers and publishers of a certain seditious libel, together with their papers. In the statute under consideration, and in the complaint, and warrant, the property to be searched for and seized is described as intoxicating liquor, and it could not well be designated with more particularity. It could not have been the intention of the constitution, to require the things, to be searched for and seized, to be so particularly described, as to prevent any beneficial purpose to be accomplished by a search warrant. All that should be required is to describe them, as nearly as may be. If the liquor had been described, by a designation of its particular kind, or species, instead of using the generic term, it is difficult to see how this would have given more certainty; and besides in most cases it would be impracticable.

The ownership of property is no part of its description ; and no allusion is made to it in the constitution. In many cases it will be impracticable, to so describe liquors, intended for sale contrary to law, or stolen goods, as will enable the officer to distinguish them from others, of a similar kind, not intended for sale, or not stolen. Suppose the property be a given number of pieces of cotton cloth having no ear mark, how could they be distinguished, with any certainty, by the officer, from others of a like kind. It is no sufficient objection, to the validity of these proceedings to say, that innocent persons may be subjected to the inconvenince of having their property seized under them. If they do, the law opens the door for their redress.

The constitution of Maine requires " special designation of the place to be searched, and of the person or thing to be seized; and yet in the case of the *State* v. *Robinson*, 33 Maine, 568, it was

held, that a description by the generic term "intoxicating liquor," was sufficiently special. We think, then, neither the statute nor the complaint and warrant, are void, for not requiring, or having a more particular designation, of the thing to be searched for and seized. The statute says, "and if any intoxicating liquor is found therein, under circumstances warranting the belief, that it is intended for sale contrary to the provisions of the act, such officer shall seize the same," &c. The warrant contains a like direction. Though the seizure of the officer is not, from the language of the act, necessarily confined to the intoxicating liquors, in fact, on the premises at the time of praying out the complaint and warrant; yet practically it would almost invariably be so; but he is confined to such, as there is good reason to believe, are intended for sale contrary to the statute. Should this render the law unconstitutional, and the warrant void? The right of search was complete in the officer, at the time the warrant issued; unless avoided by the provision in the law. At common law, it was said that general search warrants should not be sustained; because it was not fit that it should be left to the officer to judge of the ground of suspicion; but that this belonged to the magistrate who issued the warrant, and therefore the warrant should give certain and precise directions. But there are many cases where the law making power has given the right to apprehend, under general warrants; as in the case of loose, idle and disorderly persons; and also where they have given the right to individuals or officers of the government, to seize, upon probable cause, personal property, and in some cases even destroy it. We instance the laws of congress, in relation to the revenue; and the act relative to intoxicating liquors, carried into the Indian country; and the acts in most of the states, in relation to dogs found worrying sheep; and in some, the provision for the forfeiture of the race horse to the captor, and the quarantine laws which give the health officer the right to destroy private property.

These are but a few among the many cases, where this conservative power of the government has been exercised, and without objection. We see no constitutional objection in extending the powers of the officer, so as to enable him to seize all the intoxicating liquor found by him on the premises, described in his war-

rant, and which he has good reason to believe are intended for sale in violation of the statute, and there is nothing oppressive in this. He is rightfully in possession of the premises, and is empowered to make search, his warrant describing the property to be seized, by its generic term. The officer acts under his official oath, and to a certain extent, the powers of an informing and executive officer are combined in him. The decision of the officer has no effect upon the rights of the owner of the liquor; but simply to bring it before the magistrate, so as to give him jurisdiction over it, in a proceeding *in rem*, and this is precisely what is done upon probable cause, by a collector of customs, under the revenue laws of the United States, for a supposed attempt to avoid the payment of duties.

In regard to the complaint, we do not think it was essential in any way, that the statute should, as a proceeding *in rem*, have required the complainants to have given the name of the person, who has the liquor in deposit, and by whom it was intended to be sold; or that the magistrate should state in his search warrant to the officer the name of the particular person believed to be the owner or keeper of such liquor; nor the name of any person having the custody or possession of the same; nor the name of any person having the intention to sell. It was not the object of the statute, to lay the ground of a proceeding to apprehend the body of any one, and bring him before the justice, together with the liquor seized; and for this reason the statute is only made to act upon the place to be searched, and the thing to be searched for; and this is all the constitution requires in a case like this.

The right to a proceeding *in rem* against the liquor is complete, when it is deposited in any town in any of the places mentioned in the statute by any person, and intended for sale in violation of the act. The possession of intoxicating liquor is made unlawful, and the keeping of it, is intended to be treated, by the act, as a nuisance, when kept and intended for sale against the provisions of the act; and the right of seizure is only made coextensive with the offence. There may be some doubt in regard to the construction of the statute, as to the place where there must be an intention to make sale; but we apprehend, that this is not necessarily confined to the town where the liquor is deposited; and that it is sufficient

if there is an intention to sell it against the provisions of the law, at any place within the state. This would be within the mischief intended to be avoided by the statute; and to effect the remedy designed and to avoid the mischief, we should give the statute that construction; and besides such is the natural import of the language used in the act. There is no limitation as to places, after the words, "and intended for sale;" and the officer is to be directed upon search of the premises, if any intoxicating liquor is there found, under circumstances warranting the belief that it is intended for sale contrary to the provisions of the act, to seize, &c. This would seem as if the intention to sell might be co-extensive with the obligatory power of the act.

It is important to see if there is any substantial objection in the commencement and course of the proceedings, pointed out in the act to obtain a condemnation of the liquor, kept and intended for sale in violation of the act. It is by means of the seizure, that the liquor is brought within the reach of the process of the court; and, constructively, into its possession and this is necessary to give a right to proceed against the property.

The complaint is to be sworn to, and it is to state that the complainants "have reason to believe," &c., and the form given in the statute for a complaint, (which is followed in the present case,) requires all the facts necessary to give a right to issue the warrant to be stated. The theory of this proceeding is upon the ground, that the owner or keeper of the liquor is presumed to be unknown to the complainants, and in most cases such probably would be the fact, and the legislation we think, was based upon that hypothesis.

It has already been remarked, that the seizure is confined to such intoxicating liquors, as the officer believes are intended for sale against the provisions of the law. The statute makes it the duty of the officer to summon the owner or keeper, &c., if known to him. What possible objection is there to this? If it should be said, that the officer may summon a person, as owner or keeper, on mistaken ground, and that the property might be condemned and destroyed without an opportunity being given to the true owner to appear and defend, a sufficient answer to this, is, if such should be the case, and the property be proceeded against without

any further notice, that the true owner would not be bound by the proceedings. The statute says, "if the owner or keeper is known," &c., "he shall be summoned," &c. This, we think, should be understood, as the term, summons, is usually used in legal proceedings; and that he was to be served with an attested copy of the complaint and warrant, as summons are required to be served by the standing laws; which was done in this case. It is objected, that the statute requires the owner or keeper of the liquor to appear forthwith, &c. But does this constitute any constitutional objection to the law? Warrants need not state the time when the party is to be brought before the magistrate for examination; and it is of every day occurrence to have them issued and made returnable forthwith, and if this can be done where the liberty of the subject is concerned, can it not be done where property alone is concerned? It is not to be presumed that the magistrate will act oppressively or unreasonably in not giving the claimant a full and ample opportunity to appear and defend his rights; and thus make the presumed abuse of authority, by the magistrate, the ground of holding the law unconstitutional. We are rather to presume that "all things will be done rightly," and the law administered benignly and according to its spirit. If the service of the summons should be by leaving a copy at the usual place of abode of the owner or keeper, which might operate as constructive notice, it would be competent and proper for the magistrate to delay proceedings, on the return of the complaint and warrant, and cause actual notice to be given.

It is important to see if there is any substantial objection, in the commencement and course of proceedings, pointed out in the act, to obtain a condemnation of the liquor. It is urged that there is no place required in the statute to be specified, where the owner or keeper is to appear before the magistrate, and that for this cause the act is unconstitutional. This looks to us to be small ground to stand upon.

The owner or keeper is to be served with a copy of the magistrate's process; and it may well be supposed the magistrate has a fixed and notorious place of abode in the county, and place of business, which is either known or may be known, upon reasonable inquiry, by the owner or keeper of the liquors. The difficulties

arising from this omission in the statute are fanciful and imaginary. As in the present case, Lincoln was summoned by the officer to appear before the magistrate, and did appear to claim the property, there is no occasion to spend time with the thirteenth section, which provides for giving notice, and prescribes the course of proceeding where the owner or keeper is unknown to the officer. And as no appeal was claimed by Lincoln under the fourteenth section, he has nothing to complain of under that section.

It is said that the 12th section makes no provision for a trial, for a judicial proof of the facts upon the truth of which alone, the property can be justly condemned and destroyed, and that the judgment may pass without proof and without trial. But let us examine the provisions of the statute in this respect. An adjudication of a forfeiture of the liquor must be grounded upon a keeping with an intent to sell, for it is the intent to sell that stamps the character of illegality upon the keeping, and it may be conceded that this intent must be the intent of the owner, or some one in the possession of the liquor under his authority. It would be somewhat remarkable, if an enlightened legislature at the present day should pass a law with an intention to have liquors adjudged forfeited by a judicial tribunal, and ordered to be destroyed, without a trial, and without proof that they were intended for sale contrary to law; and we apprehend the statute does not require us to put the legislature, who passed this act, in so awkward a dilemma.

The statute proceeds, and justly, upon the ground that a *prima facie* case, or at least, that a probable cause had been made out, upon which, unless rebutted, a judgment of condemnation might pass.

The warrant is issued; the liquors are seized and brought under the cognizance of the magistrate, and in effect into court; and are constructively in his possession, subject to his order; and the owner or keeper is summoned to show cause why they should not be condemned; and he appears or neglects to appear, at his election; and it should be borne in mind, that the proceeding is only against the property of the person summoned, and binding upon his rights and not upon any body else. We apprehend that the fact, that the intoxicating liquor was found in the possession of the respondent, when seized by the officer, unexplained does furnish evidence

of a probable cause, if not *prima facie* evidence of an unlawful intent to sell. There was no pretence that Lincoln was the author-ized agent of the town to sell in the special cases, mentioned in the statute ; and if he claimed the special character of a town agent, he should show it. The question then arises, what is the presump-tion in regard to this use of the barrel of rum ? It is not to be dis-guised, that the liquor is, in such a quantity, designed for sale, ordi-narily ; and if designed for sale, it not appearing affirmatively, that the defendant had authority to sell, it is to be taken that an unlaw-ful selling was intended.

We have always held in trials upon an information or indict-ment, for a violation of our license laws, that after proofs of sale, it would be intended to be an unlawful sale, unless the defendant proved he had a license. All that is now required of us is to' test the validity of the statutes, as applied to such a case as we have before us.

One provision in a statute may be constitutional, and another unconstitutional. One section of a statute may be constitutional as applied to one supposed state of facts, and unconstitutional as applied to another.

There is nothing in the statute which attempts to make the com-plaint or the officer's return upon the warrant, any affirmative evi-dence for the magistrate to proceed upon, in the condemnation of the liquor. The praying out the complaint was *ex parte;* but the return of the officer upon the warrant, is at least *prima facie* evidence of his proceedings under it; that is, that he seized the liquor which he brings into court at the place designated in his warrant, for him to search; and that he summoned the supposed owner or keeper to appear before the magistrate, and show cause, &c. If the per-son summoned as owner does not appear, or if he appears and does not contest the ownership of the property, as against himself, he is taken to be the owner. Still if the officer made a mistake as to the owner, the rights of the true owner would not be prejudiced by the proceedings against the liquor. In the case before us, Lincoln appeared as claimant; and there was no pretense he was not the owner; and having failed to introduce any exculpatory evidence, the barrel of rum was adjudged forfeited. The magistrate in his record says, " that it was shown and proved to his satisfaction, that

·the said barrel of rum was intended for sale by the said Lincoln, contrary to the provisions of the statute."

The case of the *American Fur Company* v. *United States*, 2 Peters, 358, has a strong bearing upon this question. That case involved a proceeding upon a libel or information, the object of which was to obtain a decree of forfeiture and condemnation of certain goods carried into the Indian country for the purpose of trading with the Indians, by an Indian trader; and the libel charged that the Indian trader, among the goods carried, did also carry into the said Indian country, seven kegs of whiskey and one keg of shrub, for the purpose of vending or distributing the same among the Indian tribes, contrary to the statute in such cases made and provided, and against the peace, &c.

On the trial, the attorney for the government requested the court to charge the jury, " that if they found from the evidence, that the defendant as an Indian trader, did carry ardent spirits into the Indian country, and that the same was found there among any part of his goods, that it was *prima facie* evidence of his having violated the acts of congress, on which the prosecution was founded, so as to throw the burden of the proof on the defendant. This instruction the district court did give the jury, adding that an Indian trader might lawfully carry ardent spirits into an Indian country for some purposes; as for medical use. It was argued by the counsel for the claimants, in the supreme court, that it was incumbent on the government not only to show that the spirits were carried into the Indian country, but that the same was done with an intent to sell them, and that the jury was to judge of the intention, and that this was taken from them by the instructions given. Justice WASHINGTON, who delivered the opinion of the supreme court, alluding to the above instructions of the district court, says, " they meet our entire approbation."

We will suppose another case. A man is found in possession of a roll of counterfeit bills. This, standing alone, makes a *prima facie* intent to pass them, though he might have had them in his possession for a lawful purpose. *Rice* v. *Fuller et al*, Rus. & Ry. 308. This upon the principle, that ordinarily counterfeit bills are possessed for the purpose of being put in circulation. So spirituous liquors kept in any considerable quantities, are ordinarily

designed for sale. Hence, the presumption, where there is a total want of proof to rebut it, that the possession in both cases is a guilty possession, if the law prohibits the possession of intoxicating liquors for the purpose of sale. This is only founding a presumption upon our experience of human conduct; and rests upon the same basis, which makes a receipt for the last quarter's rent *prima facie* evidence of the payment of all the rent which had previously accrued. If it should be said, that this overthrows the presumption of innocence, be it so. There is no constitutional objection to the passage of a law, that such a presumption should be overcome, by a presumption founded upon the experience of human conduct; and it was competent for the legislature to enact what evidence should be sufficient to overcome such a presumption. The presumption of innocence, upon common principles, may be overthrown; and a contrary presumption raised by the misconduct of the party, in suppressing or destroying evidence, which he either ought to produce, or to which the other party was entitled.

But suppose the possession of a quantity of liquor, unexplained, does not furnish a presumption that a sale of it is intended; it, at all events, furnishes probable cause to believe such is the fact, and this has been held sufficient to rebut the presumption of innocence in cases of seizure under the revenue law of 1799. See *Locke* v. *United States*, 7 Cranch, 339. The seventy-first section of that statute provides that, " if the property be claimed by any person, in every such case, the *onus probandi* shall be upon such claimants, only where probable cause is shown for such prosecution." One question in the above case was, what was the meaning of congress in the use of the term *probable cause*. Did it mean *prima facie* evidence of guilt, or something less? And it was settled that it meant less evidence than would justify a condemnation, and that in all cases of seizure, it had a fixed and well known meaning, and imported a seizure made under circumstances which justified a suspicion, that this was the legal sense of the term, and that the court must understand that congress used it in this sense. Here then, is a case where congress have cast the burden of proof upon the claimant, upon probable cause being shown for the prosecution, and the court held that this was sufficient to overcome the presumption of innocence, and affirmed the decree of forfeiture of the property,

simply upon the government showing a probable cause for the prosecution, there being no sufficient evidence introduced on the other side to rebut the existence of it. In such a case, condemnation passes from the defect of testimony on the part of the claimant, *The Luminary*, 8 Wheat. 407. In the case before us, the barrel of rum is taken upon the premises searched, it is brought before the court, and Lincoln is summoned to appear, and in fact appears as claimant. The case, then, is clearly one, where there was a probable cause for the prosecution; and in such a case there is no objection that the legislature should authorize a condemnation unless it is rebutted; and when applied to such a case there can be no objection to the validity of the statute. If necessary, a court may restrict the general language of a statute, so as to accomplish the general intent and purpose of it. The case of the *Commonwealth* v. *Dana*, 2 Met. 329, seems to us a sound case; and by analogy it has a strong bearing upon the validity of the twelfth section of the act which we are now considering. The Massachusetts statute prohibited the sale of lottery tickets, or the possession of the same with the intention to sell. The act authorized any magistrate to issue warrants, " to search for and seize lottery tickets, or materials for a lottery," unlawfully made, provided or procured for the purpose of drawing a lottery, when he should be satisfied that there was reasonable cause. Though it was urged that this statute was void, as being contrary to civil liberty, natural justice and the bill of rights, which secures every subject against all unreasonable searches and seizures of his person, property and papers; yet the law was sustained; the court well holding that it was not the intention of that article in their bill of rights, to prohibit all searches and seizures of a man's person, his papers and his possessions, but such only as were unreasonable, and the foundation of which was not previously supported by oath or affirmation. This statute was based upon the supposition, that the promotion of lotteries is against sound morals; and is a strong authority for applying the search and seizure principle to intoxicating liquors, when kept for sale contrary to law. It is said that this act is unconstitutional, as it does not entitle the party to a trial by jury. We have no doubt, the " right of trial by jury " spoken of in the constitution, and which it is said " ought to be held sacred," means a

jury as at common law, which consists of twelve men, and that wherever a constitution guaranties "the right of trial by jury," it is not competent for a legislature to reduce that number to six, or any less number than twelve; for the very theory of a trial by jury requires the unanimous consent of twelve men to the verdict. But we are satisfied that the provisions in our constitution were not intended to apply to such a case as this; and it may not be amiss here to remark that the provisions in the constitution of the United States relative to jury trials apply only to the federal courts. *In the matter of Smith*, 10 Wend, 449. It has been the practical construction given to our constitution since its adoption, in 1793, for the legislature to give to justices of the peace, the power to hear and determine certain cases both civil and criminal without the intervention of a jury of twelve men; and in some cases no appeal is allowed. It would require great boldness to disturb a practical construction, so long acquiesced in. The provision in our statutes that before justices of the peace, either party may have a jury trial by six jurors, has never been considered as a compliance with the constitution " securing the right of trial by jury;" but rather that it does not apply to suits or prosecutions before a single magistrate. The language of the twelfth article of our bill of rights, it is true, is quite broad. It might at the first blush seem to secure the right of jury trial in all cases, where an issue of fact, proper for the cognizance of a jury, is joined in a court of law; but all the provisions in the constitution are to be construed together; and the thirty-first section of chapter second provides that trial of issues proper for the cognizance of a jury, in the supreme and county court shall be by jury, unless the parties otherwise agree, and certainly they might waive the right. We think the general words in the twelfth article of our bill of rights should be restrained in their application by the thirty-first section of chapter second, and this has been the practical construction, confining their operation to the trials in the supreme and county courts.

The tenth article in our bill of rights provides " that in all prosecutions for criminal offences a person hath a right to be heard by himself and counsel; to demand the cause and nature of his accusation; to be confronted with witnesses; to call for evidence in his favor, and a speedy public trial by an impartial jury of his country,

without the unanimous consent of which jury he cannot be found guilty; nor can he be compelled to give evidence against himself; nor can any person be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers. It is a question of some importance, whether Lincoln was entitled constitutionally to a trial by jury, under the above article in our bill of rights. If he was, it must follow that all our statutes, giving to justices of the peace, cognizance to try and determine criminal offences upon the complaint of a town grand juror, without a jury of twelve men, are unconstitutional.

The practical construction has been to confine the operation of this article in our bill of rights, so far as a jury trial is concerned, to prosecutions by indictment or information. The words indictment or information have a well known meaning at the common law. The term *indictment*, imports a written accusation of a crime or misdemeanor preferred to and prosecuted on oath by a grand jury ; and an *information* at the common law is an accusation in writing, filed by the king's attorney, usually called the attorney-general, and with us by the state's attorney. When accusations are made to single magistrates by town grand jurors, tithing men, &c., they are termed complaints. So in the statute of 1852, the accusation made by the three voters of a town is termed a complaint. A complaint may not differ much in its form from an information ; yet it comes from a different source. In *Goddard* v. *The State*, 12 Conn. 448, it was held that upon a complaint for a breach of the Sabbath, the party accused could not before the justice constitutionally claim a jury trial. The ninth article however in the Connecticut bill of rights differs from ours, inasmuch as the words, " and in all prosecutions by indictment or information," are inserted before " a speedy trial by an impartial jury ;" but the practical construction has been the same.

But the fourteenth section of the act gives to the person claiming the liquor an appeal from the said justice upon his giving a bond, &c. Though this statute does not specify to what court the appeal is to be taken, or the term when the entry shall be made, or regulate the course of proceedings; yet all these things will fall under the general law relative to appeals from the decisions of justices of the peace to the county court; and in the county court

the plaintiff would have been entitled to his trial by a jury of twelve men ; and it is quite well settled, that if a legislature pass an act giving to a justice of the peace power to hear and decide a cause, without the intervention of a jury, but the act gives the right of appeal to a court which tries causes by a jury, it is no such violation of the right of trial by jury, as to render the act unconstitutional ; although had the judgment of the justice been final, it might have been. Though the party may be put to some expense and inconvenience, yet the right is not taken away, or so far impaired as to render the act void.  The right of appeal is not so trammelled by the fourteenth section, as to clog the exercise of the right, so as to render its enjoyment unreasonable and oppressive.  *Beers* v. *Beers,* 4 Conn. 535.  *Emerick* v. *Harris,* 1 Binney, 424.  *Biddle* v. *Commonwealth,* 13 Searg. & Rawl. 405.  *Sheldie* v. *Moore,* 2 Murphy, 41.  3 Yerger, 444.  4 Bibb, 416.

The closing paragraph of the tenth article in our bill of rights is, " nor can any person be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers ;" dropping the words, life and property, which are inserted in most of the state constitutions.  The liberty, spoken of in our bill of rights, is the liberty of the person of every subject; and the right to the enjoyment of life is personal to all ; and a proceeding affecting the life of a subject may well be termed a proceeding to deprive him of his natural personal liberty ; all this is involved.  The proceedings before a justice of the peace, under the twelfth section of the statute, act purely upon the property of the defendant; and do not involve the personal liberty of the subject.  The only powers given the justice are to adjudge the liquor forfeiteted, and order it to be destroyed ; and inflict a fine of $20, and costs.  The infliction of a fine does not act upon the personal liberty of the subject any more than it would to render judgment against him in a civil action. Though upon appeal to the county court, they may, in certain cases, upon conviction, sentence to an imprisonment in the county jail, yet in that court, the defendant has a right of trial by a jury of twelve men.

The words, "by the laws of the land," as used originally in *magna charta,* as is said by Lord COKE in reference to this subject, mean the same as " due process of law ;" that is by indictment or

presentment of good and lawful men; and this is said to be the true sense and exposition of the words; and, as STORY says, due process of law means law in its regular course of administration through courts of justice, 3 Story's Comm. on Const. 264, 661. The "judgment of his peers," is usually understood to imply a trial by a jury of twelve men. Under our constitution, these provisions seem simply to qualify the right of the legislature to deprive a subject of his liberty; and it confines their operation to prosecutions for the higher offences by indictment or information; and they do not extend to petty offences, punishable by a justice of the peace by complaint; and it is quite sure they have no bearing upon a proceeding before a magistrate under the twelfth section of the act of 1852.

This case involves the validity of the proceedings only as proceedings *in rem*, to effect the forfeiture and destruction of the liquors. We have no occasion to inquire whether that part of the statute, directing proceedings *in personam*, is repugnant to the constitution or not; but I apprehend there can be but little doubt, that when the legislature say, " and the owner or keeper of such liquor shall pay to said town a fine of twenty dollars and cost, if, *in the opinion of said justice* said liquor was kept or deposited for the purpose of sale, contrary to the provisions of the act;" they refer to a *judicial opinion* to be formed upon an examination and proof. They speak of the magistrate in his official character, and the opinion is to be formed in a judicial proceeding. Unless he was to examine and hear proofs, the magistrate could not well have an opinion; for it can hardly be claimed to have been the intention of the legislature, that the justice should base his opinion upon any private knowledge of his own, and much less that he should form an opinion without any means to enable him to do it. Whether the statute prescribes and requires such a complaint, so charging an offence, as to satisfy constitutional requirements, and justify a conviction, it would be aside of our duty now to inquire. Certain it is the form of the proceedings pointed out in the statute, and followed by the prosecution in the case, is sufficient to justify proceedings against the liquor. The statute goes upon the ground, that the liquor is illegally kept, and being so kept it becomes so noxious to the public good, as *de facto* to become a nuisance; and it is because it

has become so noxious, in the eye of the law, that it is adjudged forfeited, whereby the owner is divested of his right of property in it. The complaint under this statute, comes in place of the libel or information, where property is seized under the laws of congress, and proceedings are instituted against the things seized; but it contains a substantive statement of the offence upon which the prosecution is founded, and charges the offence in the words of the statute; and this has always been held sufficient, provided it be so described, that if the allegation be true, the case must be within the law. The complaint charges an unlawful possession of the liquor with an intent to sell generally, contrary to the statute; including of course this state as well as all other places; and although the statute must require an intent to sell within the state, yet this would not affect the validity of the complaint, but the matter would be regulated by the proof. The statute does not require the complaint to state the owner's name, or allege that the liquor belongs to some person unknown, and it is of no importance that it should. The theory of the statute is that the owner is unknown to the complainants, and if the officer ascertains the owner, and gives him notice, as to him, it supersedes the necessity of a constructive notice by publication; this notice by the officer, however, does not affect the rights of other persons. The laws of congress in case of seizures require only constructive notice; and this binds the true owner. The precedents in the courts of admiralty, do not all allege that the property belongs to some person unknown to the prosecutor.

The result then, to which we have come, is, that the proceedings offered to be given in evidence, on the trial of this cause, are valid as proceedings *in rem*, and this is all that it is necessary to decide to entitle the defendants to a new trial.

Judgment of the county court reversed and the case remanded.

REDFIELD, CH. J., dissenting to the extent indicated in his opinion in *State* v. *Prescott*, ante p. 194.