## Joseph Benning, et al. v. State of Vermont

[641 A.2d 757]

No. 93–043

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed January 28, 1994

Motion for Reargument Denied March 17, 1994

*Joseph C. Benning*, Lyndonville, for Plaintiffs-Appellants.

*Jeffrey L. Amestoy*, Attorney General, and *Scott A. Whitted*, Assistant Attorney General, Montpelier, for Defendant-Appellee.

**Dooley, J.** Plaintiffs Joseph C. Benning, the Northeast Kingdom Chapter of Freedom of the Road, and the parent organiza-

tion *Freedom of the Road* appeal from a decision of the Caledonia Superior Court dismissing plaintiffs' request for declaratory and injunctive relief from 23 V.S.A. § 1256, the motorcycle headgear statute, and a subsequent denial of their motion for reconsideration. We affirm.

In 1989, plaintiff Benning was cited for a violation of § 1256 for operating a motorcycle without wearing approved headgear. However, the Caledonia County State's Attorney dismissed the citation because he found the statute vague and was unable to establish the elements necessary to prosecute the crime. Plaintiffs subsequently filed suit,[1] seeking to have § 1256 declared unconstitutional and to have the State enjoined from further enforcement of the statute. Plaintiffs make three arguments based solely on the state constitution: (1) the statute is repugnant to the tenor, spirit and intent of the Vermont Constitution; (2) the statute is void for vagueness; and (3) the statute denies plaintiffs equal protection of the laws. We address each contention in turn.

## I.

Section 1256 was enacted in 1968, and states in full:

> No person may operate or ride upon a motorcycle upon a highway unless he wears upon his head protective headgear reflectorized in part and of a type approved by the commissioner. The headgear shall be equipped with either a neck or chin strap.

The Commissioner of Motor Vehicles is charged with administration of this statute, 23 V.S.A. § 1, including the duty to promulgate regulations thereunder. *Id.* § 1001(a).

Within a year of its enactment, the statute came under challenge in *State v. Solomon*, 128 Vt. 197, 260 A.2d 377 (1969). This decision necessarily informs our current consideration of

---

[1] Plaintiffs Benning and the Northeast Kingdom Chapter originally filed suit against Jeffrey Amestoy in his capacity as Attorney General of the State of Vermont. Pursuant to a November 1991 stipulation, the State of Vermont was substituted as defendant in lieu of the Attorney General, and the parent organization of Freedom of the Road was added as a party plaintiff.

Defendant has not argued that this challenge to a criminal statute is improper or that any of the plaintiffs lack standing to bring this action. Therefore, we have not considered these questions.

§ 1256. In *Solomon*, we upheld the validity of § 1256 against arguments that the statute exceeded the scope of the state's police power and violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. This Court concluded then that § 1256 was "directly related to highway safety" because an unprotected motorcycle operator could be affected by roadway hazards, temporarily lose control and become a menace to other motorists. *Id.* at 200, 260 A.2d at 379. The Court also concluded that "self-injury may be of such a nature to also invoke a general public concern." *Id.* at 201, 260 A.2d at 380. As a result, we held that § 1256 "bears a real and substantial relation to the public health and general welfare and it is a valid exercise of the police power." *Id.* at 202, 260 A.2d at 380.

In this case, plaintiffs attempt to distinguish their attack on § 1256 from *Solomon* on the grounds that *Solomon* was decided solely on federal constitutional grounds, whereas they challenge § 1256 on state constitutional grounds.[2] Specifically, plaintiffs argue that § 1256 violates Chapter I, Articles 1, 9, 11 and 18 of the Vermont Constitution. As we recognized in *State v. Kirchoff*, 156 Vt. 1, 4, 587 A.2d 988, 991 (1991), "[t]he Vermont Constitution may afford greater protection to individual rights than do the provisions of the federal charter." Plaintiffs argue vigorously that this is a circumstance of greater protection.

Plaintiffs base this argument almost entirely on Chapter I, Article 1 of the Vermont Constitution, which provides:

> That all men are born equally free and independent, and have certain natural, inherent, and unalienable rights,

---

[2] In their complaint, plaintiffs contended that § 1256 violated both federal and state constitutional provisions. However, on appeal, plaintiffs have briefed only the state constitutional issues. While this Court need not address matters not adequately briefed, see *Rowe v. Brown*, 157 Vt. 373, 379, 599 A.2d 333, 337 (1991), our treatment of the state constitutional issues necessarily implicates the federal constitution. Although the state constitution may afford greater individual rights than its federal counterpart, *State v. Kirchoff*, 156 Vt. 1, 4, 587 A.2d 988, 991 (1991), it may not derogate any rights guaranteed under the latter. *In re E.T.C.*, 141 Vt. 375, 378, 449 A.2d 937, 938 (1982). As a result, a conclusion of constitutionality under Vermont constitutional provisions necessarily implies a similar conclusion under comparable provisions of the federal constitution.

amongst which are the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety . . . .

Plaintiffs argue that both safety and liberty are among the "natural, inherent, and unalienable rights" guaranteed by the Article. As to safety, plaintiffs argue that the text gives individuals, not the government, the power to determine what is necessary for personal safety. Plaintiffs claim that they have a liberty interest in operating a motorcycle without a helmet, and since the purpose behind the statute is to protect the safety of the motorcycle operator, it offends their right to determine their own safety needs.

We have a number of tools in construing our constitution, including our own decisions, the wording of the text, historical analysis, construction of similar provisions in other state constitutions and sociological materials. See *State v. DeLaBruere*, 154 Vt. 237, 262–63, 577 A.2d 254, 268 (1990). Plaintiffs urge us to use many of these tools.

■ We find sparse help for plaintiffs in the text of Article 1 and in our decisions construing this text. The constitutions of the New England states have been described as "basically philosophic documents designed first and foremost to set a direction for civil society and to express and institutionalize a theory of republican government." Elazar, *The Principles and Traditions Underlying State Constitutions*, 12 Publius: The Journal of Federalism 18 (1982), in *State Constitutional Law: Cases & Materials* 30, 31 (1988). That approach is clearly evident in Article 1. The article expresses fundamental, general principles that underlie more specific statements of rights and powers set forth elsewhere in the Constitution. See *State v. Wood*, 148 Vt. 479, 487, 536 A.2d 902, 907 (1987). Thus, in *State v. Cadigan*, 73 Vt. 245, 252, 50 A. 1079, 1081 (1901), we described Articles 1, 4 and 7 as "the fundamental principles, not of our state only, but of Anglo-Saxon government itself, enlarging upon the axiom that when the facts are the same the law is the same, and inspired by the ideal of justice, that the law is no respecter of persons."

Given the nature of Article 1, it is not surprising that we can discover no instance where this Court has struck down an act of

the Vermont Legislature solely because of a violation of Article 1.[3] The main reason is found in *State v. Carruth*, 85 Vt. 271, 81 A. 922 (1911), in which the defendant claimed that Article 1 gave him the right to shoot a deer on his land out of season, despite a criminal statute to the contrary. Concerning Article 1, this Court wrote: "Many things contained in the bill of rights found in our State Constitutions 'are not, and from the very nature of the case cannot be, so certain and definite in character as to form rules for judicial decisions; and they are declared rather as guides to the legislative judgment than as marking an absolute limitation of power.'" *Id.* at 273–74, 81 A. at 923 (quoting Cooley, Constitutional Limitations 210).

The specific words on which plaintiffs rely lack the specificity that would show the presence of concrete rights applicable to these circumstances. Plaintiffs' right to pursue and obtain safety does not suggest the government is powerless to protect the safety of individuals. Indeed, our recent references to Article 1 suggest that the individual pursues safety through governmental action. See *State v. Record*, 150 Vt. 84, 87, 548 A.2d 422, 424 (1988). The juxtaposition of safety and happiness is consistent with a general statement of principle rather than an enforceable right. Cf. *Welch v. Seery*, 138 Vt. 126, 128, 411 A.2d 1351, 1352 (1980) (Article 6 is "but a truism of a republican form of government . . . [for which the] remedy . . . is that of popular election").

Plaintiffs also rely on their right of "enjoying and defending . . . liberty" as expressed in the Article. The term "liberty" is, of course, a centerpiece of the Fourteenth Amendment on which *Solomon* relies. We are willing to give a broad reading to the term "liberty," see *Cadigan*, 73 Vt. at 251, 50 A. at 1081, but it is a vast expansion of the term to find within it a right to ride helmetless on public highways. Thus, even if we were to inter-

---

[3] The closest we have come is to hold that the liberty interest protected by Article 1 is sufficiently important that involuntary mental health treatment orders deny due process of law if of indefinite duration. See *In re G.K.*, 147 Vt. 174, 178, 514 A.2d 1031, 1033 (1986); see also *G.T. v. Stone*, 159 Vt. 607, 613–14, 622 A.2d 491, 494–95 (1992) (Article 1 requires hearing before revocation of conditional discharge from state mental institution). The nature of the liberty interest in *G.K.* makes that precedent unhelpful to plaintiffs in this case.

pret Article 1 as a specific, enforceable constraint on state regulatory action, the wording falls short of supporting plaintiffs' case.

We must also acknowledge that we have often treated what protections we have found in Article 1 as coextensive with those of the Fourteenth Amendment to the United States Constitution. See, e.g., *Anchor Hocking Glass Corp. v. Barber*, 118 Vt. 206, 219, 105 A.2d 271, 279–80 (1954); *State v. Haskell*, 84 Vt. 429, 441–42, 79 A. 852, 858 (1911). For example, in *Haskell*, when defendant argued that a criminal statute was unconstitutional under the Fourteenth Amendment to the United States Constitution and Articles 1 and 7 of the Vermont Constitution, this Court analyzed the challenge with respect to federal law and added "[w]hat we have said respecting the former is as well an answer to the latter." *Haskell*, 84 Vt. at 441–42, 79 A. at 858. The essential similarity in the purposes of the constitutional provisions can be explained by the analysis of *Lincoln v. Smith*, 27 Vt. 328, 361 (1855). There, the Court described Article 1 as "a recitation of some of the natural rights of men before entering into the social compact," *id.* at 340, but explained: "[W]hen men enter into the social compact, they give up a part of their natural rights, and consent that they shall be so far restrained in the enjoyment of them by the laws of society, as is necessary and expedient for the general advantage of the public." *Id.* at 339.

The decisions of other jurisdictions are equally unhelpful to plaintiffs. Plaintiffs cite the single case that has found a motorcycle helmet law unconstitutional, specifically rejecting the *Solomon* reasoning. See *State v. Betts*, 252 N.E.2d 866, 871–72 (Ohio 1969).[4] The vast majority of state courts have adhered to reasoning similar to that of *Solomon*.[5] See, e.g., *Picou v.*

---

[4] In the late 1960s and early 1970s, a few courts did overrule motorcycle helmet laws; however, these decisions were in turn overruled. See *Picou v. Gillum*, 874 F.2d 1519, 1520 & n.1 (11th Cir. 1989) (collecting cases); see, e.g., *People of City of Adrian v. Poucher*, 247 N.W.2d 798, 799 (Mich. 1976), *overruling American Motorcycle Ass'n v. Davids*, 158 N.W.2d 72 (Mich. Ct. App. 1968).

[5] We do note that some states have chosen to revise their mandatory helmet laws to require protective headgear only for minors after upholding the constitutionality of the mandatory law. See, e.g., Alaska Stat. § 28.35.245 (1989). We do not believe that such changes in any way undercut the rationale of

*Gillum*, 874 F.2d 1519, 1521 (11th Cir. 1989) (construing Florida law); *Kingery v. Chapple*, 504 P.2d 831, 835 (Alaska 1972); *State v. Beeman*, 541 P.2d 409, 410–11 (Ariz. Ct. App. 1975); *Penney v. City of N. Little Rock*, 455 S.W.2d 132, 134 (Ark. 1970); *Love v. Bell*, 465 P.2d 118, 122–23 (Colo. 1970); *State v. Cotton*, 516 P.2d 709, 711 (Haw. 1973); *State v. Albertson*, 470 P.2d 300, 303 (Idaho 1970); *City of Wichita v. White*, 469 P.2d 287, 291 (Kan. 1970); *State v. Quinnam*, 367 A.2d 1032, 1033 (Me. 1977); *State v. Cushman*, 451 S.W.2d 17, 19 (Mo. 1970); *Robotham v. State*, 488 N.W.2d 533, 540 (Neb. 1992). Although these decisions, like *Solomon*, are based primarily on the United States Constitution, some also reject state constitutional attacks. See, e.g., *Robotham*, 488 N.W.2d at 542. The United States Supreme Court has also rejected a due process attack on a helmet law, albeit by summary affirmance of a lower court decision. See *Simon v. Sargent*, 409 U.S. 1020 (1972), *aff'g* 346 F. Supp. 277, 279 (D. Mass.).[6]

At the center of plaintiffs' argument is the assertion that Vermont values personal liberty interests so highly that the analysis under the federal constitution or the constitutions of other states is simply inapplicable here. In support of this contention, plaintiffs rely on political theorists, sociological materials and incidents in Vermont's history. Without detailing this argument, we find it unpersuasive not because it overvalues Vermont's devotion to personal liberty and autonomy, but because it undervalues the commitment of other governments to those values. The Vermont material is "only loosely connected to the issues before the Court." *DeLaBruere*, 154 Vt. at 270, 577 A.2d at 272. It does not differentiate our concern for personal liberty from that prevailing elsewhere in any way that should influence this case.

■ Certainly, if there was a heightened concern for personal liberty, there is no evidence of it in the text of the Constitution. Many states have constitutional provisions very similar to Arti-

---

these decisions.

[6] Unlike denial of certiorari, United States Supreme Court summary affirmance decisions are entitled to full precedential effect as to the judgment itself. See *Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975); see also *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).

cle 1. Compare Vt. Const. ch. I, art. 1 with Cal. Const. art. 1, § 1 ("All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty . . . and pursuing and obtaining safety, happiness, and privacy."); Mass. Const. pt. 1, art. 1 ("All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties . . . [and] that of seeking and obtaining their safety and happiness."); Nev. Const. art. 1, § 1 ("All men are by Nature free and equal and have certain inalienable rights among which are those of enjoying and defending life and liberty . . . and obtaining safety and happiness[.]"); Va. Const. art. 1, § 1 ("That all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, . . . and pursuing and obtaining happiness and safety."). Each of the constitutional provisions we have cited is in effect in a state with a motorcycle helmet law similar to § 1256.

For the above reasons, we are not convinced that Article 1 offers plaintiffs any special protections that are applicable to this case. We have also examined Articles 9, 11 and 18 on which plaintiffs place secondary reliance. None of these provisions helps plaintiffs' position.

As a result, we reject the notion that this case can be resolved on the basis of a broad right to be let alone without government interference. We accept the federal analysis of such a claim in the context of a public safety restriction applicable to motorists using public roads. We agree with Justice Powell, recently sitting by designation with the Court of Appeals for the Eleventh Circuit, who stated:

> [T]here is no broad legal or constitutional "right to be let alone" by government. In the complex society in which we live, the action and nonaction of citizens are subject to countless local, state, and federal laws and regulations. Bare invocation of a right to be let alone is an appealing rhetorical device, but it seldom advances legal inquiry, as the "right"—to the extent it exists— has no meaning outside its application to specific activities. The [federal] Con-

stitution does protect citizens from government interference in many areas—speech, religion, the security of the home. But the unconstrained right asserted by appellant has no discernible bounds, and bears little resemblance to the important but limited privacy rights recognized by our highest Court.

*Picou*, 874 F.2d at 1521; see also *Buhl v. Hannigan*, 20 Cal. Rptr. 3d 740, 748 (Ct. App. 1993) ("[I]t would be a stretch indeed to find the right to ride helmetless on a public highway comparable to the enumerated personal rights or implicit in the concept of ordered liberty."); *Bisenius v. Karns*, 165 N.W.2d 377, 384 (Wis. 1969) ("There is no place where any such right to be let alone would be less assertable than on a modern highway with cars, trucks, busses and cycles whizzing by at sixty or seventy miles an hour.").

We are left then with the familiar standard for evaluating police power regulations—essentially, that expressed in *Solomon*. Plaintiffs urge us to overrule *Solomon* because it was based on an analysis of the safety risk to other users of the roadway that is incredible. In support of their position, they offered evidence from motorcycle operators that the possibility of an operator losing control of a motorcycle and becoming a menace to others is remote. On the other hand, these operators assert that helmets make a motorcycle operator dangerous. Plaintiffs also emphasize that even supporters of helmet laws agree that their purpose is to protect the motorcycle operator, not other highway users.

We are not willing to abandon the primary rationale of *Solomon* because of plaintiffs' evidence. The statute is entitled to a presumption of constitutionality. See *Re Montpelier & Barre R.R.*, 135 Vt. 102, 103, 369 A.2d 1379, 1380 (1977). Plaintiffs are not entitled to have the courts act as a super-legislature and retry legislative judgments based on evidence presented to the court. See *State v. Giant of St. Albans, Inc.*, 128 Vt. 539, 544, 268 A.2d 739, 742 (1970); see also *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64 (1973) ("'We do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions.'") (quoting *Griswold v. Connecticut*, 381 U.S. 479,

482 (1965)). Thus, the question before us is whether the link between safety for highway users and the helmet law is rational, not whether we agree that the statute actually leads to safer highways. See *Buhl*, 20 Cal. Rptr. 3d at 744–45. The *Solomon* reasoning has been widely adopted in the many courts that have considered the constitutionality of motorcycle helmet laws. See, e.g., *Picou*, 874 F.2d at 1519; *Buhl*, 20 Cal. Rptr. 3d at 749. We still believe it supports the constitutionality of § 1256.

There are at least two additional reasons why we conclude § 1256 is constitutional. The first is referenced in *Solomon*. Although plaintiffs argue that the only person affected by the failure to wear a helmet is the operator of the motorcycle, the impact of that decision would be felt well beyond that individual. Such a decision imposes great costs on the public. As Professor Laurence Tribe has commented, ours is "a society unwilling to abandon bleeding bodies on the highway, [and] the motorcyclist or driver who endangers himself plainly imposes costs on others." L. Tribe, American Constitutional Law § 15–12, at 1372 (2d ed. 1988). This concern has been echoed in a number of opinions upholding motorcycle helmet laws. See, e.g., *Picou*, 874 F.2d at 1522 (quoting Tribe); *Simon*, 346 F. Supp. at 279 (citing public interest in minimizing resources directly involved with treating and caring for motorcyclists injured as result of riding without helmets); *Robotham*, 488 N.W.2d at 541 (citing rationale of "minimization of public expenditures for the care and welfare of seriously injured motorcyclists"). This rationale is particularly apparent as the nation as a whole, and this state in particular, debate reform of a health care system that has become too costly although many do not have access to it. Whether in taxes or insurance rates, our costs are linked to the actions of others and are driven up when others fail to take preventive steps that would minimize health care consumption. We see no constitutional barrier to legislation that requires preventive measures to minimize health care costs that are inevitably imposed on society.

■ A second rationale supports this type of a safety requirement on a public highway. Our decisions show that in numerous *circumstances* the liability for injuries that occur on our public roads may be imposed on the state, or other governmental units, and their employees. See, e.g., *Hudson v. Town of*

*E. Montpelier*, 161 Vt. 168, 638 A.2d 561 (1993); *Peters v. State*, 161 Vt. 582, 636 A.2d 340 (1993). It is rational for the state to act to minimize the extent of the injuries for which it or other governmental units may be financially responsible. The burden placed on plaintiffs who receive the benefit of the liability system is reasonable.

## II.

■ Plaintiffs next argue that § 1256 is void for vagueness. A criminal statute must "define a criminal offense with sufficient certainty so as to inform a person of ordinary intelligence of conduct which is proscribed, and such that arbitrary and discriminatory enforcement is not encouraged." *State v. Cantrell*, 151 Vt. 130, 133, 558 A.2d 639, 641 (1989). Lack of statutory clarity offends notions of due process for "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *State v. Dragon*, 133 Vt. 620, 621, 349 A.2d 720, 721 (1975) (discussing holding of *United States v. Harriss*, 347 U.S. 612, 617 (1954)). The test is less strict, however, when, as here, the statute does not threaten to inhibit the exercise of constitutionally protected rights. See *Rogers v. Watson*, 156 Vt. 483, 491, 594 A.2d 409, 414 (1991). Plaintiffs attack the validity of § 1256 on both prongs of the *Cantrell* vagueness test.

We have previously stated that "[v]agueness challenges to statutes not involving First Amendment freedoms must be examined in light of the facts." *State v. Roy*, 140 Vt. 219, 229, 436 A.2d 1090, 1095 (1981); see also *Cantrell*, 151 Vt. at 133, 558 A.2d at 641 (party whose conduct is clearly proscribed cannot complain about how statute will be applied to others). Given the procedural posture of this case, however, it is impossible to evaluate plaintiffs' challenges in a factual setting. Thus, we address only the facial validity of the statute, and not the validity of the statute as applied.

We find plaintiffs' attack unavailing. It is difficult to see how the statute could be more specific. It clearly proscribes the failure to wear an approved helmet. Plaintiffs' attack is really on the method of administration by the Vermont Commissioner of Motor Vehicles. Specifically, plaintiffs argue that motorcycl-

ists do not have fair warning because "it is virtually impossible for the motorcyclist to find out what headgear is 'approved by the commissioner.'" This in turn, plaintiffs argue, makes it impossible for police to know what is or is not an approved helmet, leading to arbitrary and discriminatory enforcement. In support of this latter contention, plaintiffs offered the testimony of the deputy sheriff, sheriff and state's attorney for Caledonia County, all of whom suggested that enforcement of § 1256 was difficult, if not impossible, due to the vagueness of the statute. Additionally, plaintiffs produced testimony from defense attorneys who were similarly confounded by the statute.

In essence, plaintiffs have turned a disagreement over how the statute should be implemented by the Commissioner into a void-for-vagueness challenge. In another regulatory context, we have held that "it is important that defendants had the opportunity to clarify their responsibilities and did not use it." *Rogers*, 156 Vt. at 491, 594 A.2d at 414. We are very reluctant to strike down a safety regime on a vagueness rationale with no showing that affected parties *on request* cannot obtain guidance on how to comply. We believe this deficiency is fatal to a facial challenge to the statute and its administration.

In any event, we find that the Commissioner of Motor Vehicles has been sufficiently clear about what headgear is acceptable. By regulation, the Commissioner has provided that a helmet is deemed approved by the Commissioner if it (1) meets the standards set out by the Motorcycle, Scooter, Allied Trades Association; the American Standards Association Inc. Z90.1; or the United States Department of Transportation Federal Motor Vehicle Safety Standards (FMVSS) 218 (49 C.F.R. § 571.218), and (2) an "approval certificate" has been issued for it by the American Association of Motor Vehicle Administrators. See Vermont Agency of Transportation, Motorcycle Protection Headgear Approval Regulations § 4 (1987). Contrary to the plaintiffs' position, we construe this regulation to mean that a helmet is approved by the Commissioner if approved by one of the standard-setting organizations pursuant to its regulations. Thus, the dispute here goes to whether operators and law enforcement personnel can determine which helmets have been approved.

The easiest method is labelling. Each set of standards provides for the labelling of an approved helmet. See *id.*, Part A,

§ 12.1 (Motorcycle, Scooter, Allied Trades Association labelling); Part B, § 8 (American Standards Association); Part C, § S5.6 (FMVSS). For example, helmets that have been approved under the FMVSS standard bear the widely recognized United States Department of Transportation (DOT) symbol. The "steel pot" infantry helmet, used as the main example by plaintiffs, lacks the labelling that shows approval.

 If labelling does not provide a certain result, motorcyclists may consult the American Association of Motor Vehicle Administrator's list, which is maintained by the Commissioner. The statement accompanying the regulations provides that a certificate of approval for each approved helmet is filed with the Commissioner. The fact that the Commissioner of Motor Vehicles does not maintain a specific state list of approved helmets also does not render the statute or the method of administration infirm.

Plaintiffs also claim that the statute is impermissibly vague and enforced discriminatorily because Vermont State Police have been instructed to look only for the DOT symbol on helmets, and not taught to be concerned with labelling by either of the other two associations. This allegation goes to the actual enforcement of § 1256 and is outside the scope of plaintiffs' facial assault. We will not consider it.

### III.

Finally, plaintiffs argue that § 1256 deprives them of the "equal protection of the laws"[7] guaranteed by Chapter I, Article 7 of the Vermont Constitution. This article of the constitution provides: "That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single man, family, or set of men . . . ." Plaintiffs make three distinct arguments: (1) motorcyclists are unfairly singled out for treatment different from all other highway users; (2) the statute requires a safety device, the helmet, that lessens some dangers, but increases others; and (3) the statute

---

[7] Plaintiffs' wording comes from the Fourteenth Amendment to the United States Constitution and not Article 7. Although the provisions have some similarity of purpose, they are not identical.

undermines its public safety purpose by requiring reflectorization without warning of the potential dangers of adhesive application to the helmet.

■ "[U]nless a 'fundamental right or suspect class is involved,' a statute comports with Article 7 if it is reasonably related to a legitimate public purpose." *State v. George*, 157 Vt. 580, 588, 602 A.2d 953, 957 (1991) (quoting *Choquette v. Perrault*, 153 Vt. 45, 52, 569 A.2d 455, 458 (1989)). There is no fundamental right here. Therefore, we return to our rational basis analysis. To prevail, one "must show that he was treated differently as a member of one class from treatment of members of another class similarly situated." *Id.* at 585, 602 A.2d at 956.

■ These challenges do not require extensive analysis. The requirement that motorcyclists don protective headgear before taking to the public highways is simply a recognition that motorcyclists do not enjoy the physical protection furnished by the body of a car or truck. We conclude that "[i]t is not difficult to discern a rational basis for the legislature's distinction between motorcyclists and . . . automobile drivers, whose vehicle affords them substantially more protection than does a motorcycle." *Simon*, 346 F. Supp. at 279. Similarly, the Legislature can apply the helmet requirement to motorcycles and not to mopeds. A statute need not regulate the whole of a field to pass constitutional muster. See *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980); see also *Commonwealth v. Guest*, 425 N.E.2d 779, 780 (Mass. App. Ct. 1981) (court will not invalidate statute merely because legislature has not addressed entire problem in defining classification). There is a rational basis for the distinction between motorcyclists and moped riders since the latter travel on average at a lower rate of speed and are forbidden from riding on state highways. See *Commonwealth v. Kautz*, 491 A.2d 864, 867 (Pa. Super. Ct. 1985) (upholding helmet law on federal equal protection grounds); *State v. Acker*, 485 P.2d 1038, 1039 (Utah 1971) (upholding law requiring helmets to be worn on roadways where the minimum posted speed is above thirty-five miles per hour, reasoning that "harm from collisions and other mishaps increases directly as the square of speed").

We have already considered plaintiffs' claim that the statute is flawed because it fails to deal with the dangers of helmet usage. This argument is for the Legislature, not this Court.

Finally, plaintiffs claim that § 1256 undermines its public safety purpose by requiring reflectorization without warning of the potential dangers of adhesive application to the helmet. Based on expert testimony, the trial court found that reflective adhesive tape cannot adversely affect the structural integrity of a motorcycle helmet. Despite the court's additional finding that certain materials[8] should not be used on helmets, the court's determination that reflectorization does not impair a helmet's structural integrity is not clearly erroneous and will not be overturned on appeal. See V.R.C.P. 52(a)(2).

In summary, we find no reason to overrule *Solomon*. As a result, we reiterate our conclusion that § 1256 "in no way violates any of the provisions of our state and federal constitutions." *Solomon*, 128 Vt. at 202, 260 A.2d at 380.

*Affirmed.*

---

[8] The court found that the following should not be used on motorcycle helmets: thermo-plastic adhesives, such as Duco Cement or hot melt; solvent-based adhesives; and thermo-setting adhesives, such as epoxy resins or superglues.