705 A.2d 311

**Anne S. FERRO**

v.

**William Michael LEWIS.**

**No. 79, Sept. Term, 1997.**

Court of Appeals of Maryland.

Feb. 10, 1998.

Steven M. Sullivan, Asst. Atty. Gen., J. Joseph Curran, Atty. Gen., Leight D. Collins and Mark H. Bowen, Asst. Attys. Gen., for Appellant.

Terrence M. Nolan, Glen Burnie, Bruce C. Bereano, Annapolis, for Appellee.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

WILNER, Judge.

Maryland Code (1992 Repl.Vol.), § 21–1306(b) of the Transportation Article, prohibits a person from operating or riding on a motorcycle "unless the individual is wearing protective headgear that meets the standards established by the Administrator [of the Motor Vehicle Administration]." Section 21–1306(d) provides that the Administrator:

"(1) *May* approve or disapprove protective headgear ... required by this section;

(2) *May* adopt and enforce regulations establishing standards and specifications for the approval of protective headgear ... and

(3) *Shall* publish lists of all protective headgear . . . that he approves, by name and type."

(Emphasis added.)

A person who violates § 21–1306(b) is guilty of a misdemeanor and is subject to a fine of up to $500. *See* § 27–101(b) of the Transportation Article.

The Administrator adopted a regulation pursuant to § 21–1306(d), which we shall describe later in this opinion, but the Administrator has never published a list of approved protective headgear by name and type. In fact, at least in recent times, the Administrator has not formally approved or disapproved of any particular headgear. Appellee, a motorcyclist who had received a number of traffic citations for operating a motorcycle without approved protective headgear, filed an action in the Circuit Court for St. Mary's County against the Administrator, the Superintendent of the Maryland State Police, and the Sheriff of St. Mary's County, seeking (1) a declaratory judgment that § 21–1306, as applied by the Administrator, is invalid and unenforceable and that the regulation itself is invalid, and (2) interlocutory and permanent injunctions prohibiting appellants from enforcing § 21–1306.

On February 28, 1997, after an evidentiary hearing, the court filed an opinion, which we shall regard as a declaratory judgment, declaring that "the Administrator must publish lists of all protective headgear that he approves, by name and type" and that "[i]f the Administrator fails to so publish, the statute shall remain unenforceable." At appellants' urging, the court stayed the issuance of an actual injunction pending the appeal that they promptly filed. We granted *certiorari* prior to proceedings in the Court of Special Appeals and, for the reasons stated in this opinion, shall reverse the judgment of the circuit court.

## LEGAL AND FACTUAL BACKGROUND

In September, 1966, Congress enacted the National Traffic and Motor Vehicle Safety Act of 1966 (Pub.L. No. 89–563). That Act, as since amended, is codified at 49 U.S.C.

§§ 30101—30169.  Section 103(a) of the Act (§ 30111(a)) directed the Secretary of Commerce (since changed to the Secretary of Transportation), by appropriate order, to establish Federal motor vehicle safety standards.  Each such standard, the section continued, shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms.

The Act makes clear the force and effect of the standards adopted pursuant to its provisions.[1]  Section 30103(b) makes the Federal standards preclusive.  With an exception allowing a State to impose a higher performance standard with respect to equipment obtained for its own use, § 30103(b)(1) provides: "When a motor vehicle safety standard is in effect under this chapter, a State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of . . . motor vehicle equipment only if the standard *is identical* to the standard prescribed under this chapter." (Emphasis added.)  Section 30103(b)(2) allows a State to enforce a standard "that is identical to a standard prescribed under this chapter."  With exceptions not relevant here, § 30112 prohibits anyone from manufacturing for sale, selling, offering for sale, introducing or delivering for introduction into interstate commerce, or importing any item of motor vehicle equipment manufactured on or after the date an applicable Federal motor vehicle safety standard takes effect unless the item complies with the standard.  Section 30115(1) requires manufacturers and distributors of motor vehicle equipment to furnish to their dealers, at the time of delivery, a certification, in the form of a label or tag on the item or on its container, that the item conforms to all applicable Federal motor vehicle safety standards;  and (2) prohibits a person from issuing the certificate if, in exercising reasonable care, the person has reason to know that the certificate is false or misleading in a material respect.

---

1. For the sake of convenience, we shall refer to and quote from the current provisions of the Act, which, to the extent relevant here, have not changed in substance since their original enactment in 1966.

Shortly after passage of the National Traffic and Motor Vehicle Safety Act, the Maryland General Assembly enacted a statute regulating the operation of motorcycles. *See* 1967 Md. Laws, ch. 437, enacting new § 195 to Md.Code (1957; 1966 Supp.), Article 66½. As introduced, the bill included a provision that "[n]o person shall ride on a motorcycle unless he is properly wearing a safety helmet approved by the Department [of Motor Vehicles]." That provision was deleted during the legislative process but, in modified form was enacted the next year. By 1968 Md. Laws, ch. 665, the General Assembly added new § 195(g) to provide that "[n]o person shall drive, or ride on as a passenger, a motorcycle ... unless he is wearing a firm and durable protective helmet or headgear, and either safety goggles or a face shield, approved by the Commissioner of Motor Vehicles." New § 195(h), also enacted by the 1968 statute, made a violation of § 195(g) a misdemeanor, punishable by a fine of between $10 and $100.

In 1970, the State motor vehicle laws were rewritten. 1970 Md. Laws, Ch. 534. Section 11–1306, which replaced § 195(g) and (h), provided, in relevant part:

"(a) No person shall operate or ride upon a motorcycle unless he is wearing protective headgear which complies with standards established by the commissioner.

. . .

(d) The commissioner is hereby authorized to approve or disapprove protective headgear and eye-protective devices required herein, and to issue and enforce regulations establishing standards and specifications for the approval thereof. The commissioner shall publish lists of all protective headgear and eye-protective devices by name and type which have been approved by him." [2]

The 1970 Act was the product of a Commission, chaired by former Baltimore City Judge S. Ralph Warnken, to study and revise the State motor vehicle laws. The Commission made a

---

**2.** The prohibition against riding on a motorcycle without wearing an approved eye-protective device was stated in § 11–1306(b).

report, which included draft legislation completely rewriting Article 66½, to the Legislative Council following the 1969 Session of the General Assembly.[3] After review by a Special Legislative Committee, the Commission bill, without significant change, was introduced as a Legislative Council Bill. Section 11–1306 survived as drafted by the Warnken Commission. *See Maryland Motor Vehicle Laws Revision,* Md. Dept. of Motor Vehicles (1969) at 389; *see also Reports and Proposed Bills To The General Assembly of 1970,* Legislative Council of Maryland (1970), Vol. 1, at 905.

Although two seemingly significant changes were made by the new law, no mention of them appears in either the Commission or the Special Legislative Committee report. Indeed, with an exception not relevant here, the Commission's comment on § 11–1306 is that it is "[s]imilar to existing law." The first change went to the basic substance of the law. The 1968 statute required riders to wear "firm and durable protective" headgear approved by the Commissioner, thus (1) making clear that rags, bandannas, and other soft coverings would not suffice, and (2) implying some duty on the part of the Commissioner to approve types or categories of headgear. The 1970 law required riders to wear headgear complying with standards established by the Commissioner. Although subsection (d) *authorized* the Commissioner to approve or disapprove headgear, as well as to promulgate regulations establishing standards for approval, it did not, on its face, require that the headgear itself be approved. To the extent there was an implicit duty under the 1970 law, it was a duty to approve standards against which particular headgear could be compared, rather than a direct duty to approve the headgear itself. The second important change, of course, was the

---

**3.** In those days, the standing legislative committees did not meet during the interim between legislative sessions. The Legislative Council, consisting of 15 Senators and 15 Delegates, was created in 1939 to perform a number of functions during the interims, including preparing a legislative program in the form of recommendations to be presented at the next session of the Legislature. *See* Md.Code (1957; 1971 Repl. Vol.) Article 40, §§ 27–40.

requirement that the Commissioner publish lists of approved headgear.

In late 1972 or early 1973, the Motor Vehicle Administration (MVA) adopted a regulation governing, among other things, motorcycle helmets and headgear.[4] *See* State Motor Vehicle Administration Regulation 11.02.08. Section .01 of the regulation stated that no person may use, loan, borrow, sell, offer, or distribute any protective helmet for use by operators or passengers of motorcycles unless "they are of a type" approved by the Administrator. Section .02 adopted as the minimum standard for such helmets the United States of America Standards Institute (ANSI) Specifications for Protective Headgear for Vehicular Users Z90.1–1966. Section .04 adopted as the test procedures for protective helmets or headgear the procedures described in those same ANSI specifications. Other sections directed that the helmets contain certain labeling and reflectorized surfaces. Section .07 required that an application for approval be accompanied by a copy of a laboratory test report from a nationally recognized, independent testing laboratory certifying that the complete helmet met the required specifications. The application was to be submitted to the American Association of Motor Vehicle Administrators in Washington, D.C., which, in turn, would furnish the Maryland MVA with a Confirmation Certificate of Approval. The Maryland Administrator would then determine "when conditions of approval have been met and a Maryland Certificate of Approval will be issued."

Although it does not appear that any list of approved helmets or headgear was ever published by MVA, as required

---

4. The precise date of the regulation is unclear. On December 20, 1972, the Regulations Coordinator for the Department of Transportation sent to the Law Librarian of the Circuit Court for Anne Arundel County, for filing, a copy of the "newly adopted rules and regulations of the Department of Transportation," which included the regulation on motorcycle helmets. That suggests, of course, that the regulation was already in place. The Administrative History of the current COMAR regulation, however, shows that the first helmet and headgear regulation became effective February 15, 1973. The inconsistency is not relevant to this case.

by the 1970 statute, the regulation did at least adopt a standard and contemplate the approval of specific helmets and the issuance of a certificate of approval for each helmet approved. Unfortunately, the standard adopted by MVA was about to become unusable.

In August, 1973, the Federal Department of Transportation, through the National Highway Traffic Safety Administration, promulgated the first Federal Motor Vehicle Safety Standard dealing with motorcycle helmets (Standard 218, 49 C.F.R. § 571.218). *See* 38 Fed. Reg. 22390 (August 20, 1973). That standard established (1) minimum performance requirements for helmets designed for use by motorcyclists, including requirements relating to impact attenuation, penetration, retention system, configuration, and projections; (2) required tests and testing procedures and conditions for determining whether headgear met the performance requirements; and (3) labeling requirements. Although the introductory comment to the regulation indicates that the ANSI standard adopted by the Maryland MVA was considered, it appears that, in some respects at least, the Federal standard departed from the ANSI standard. To that extent, by virtue of the preemption provision of the Federal statute, the ANSI standard became unusable.[5] The technical requirements embodied in the Federal standard, both substantive and relating to testing, have undergone a number of changes over the years (*see* 39 Fed. Reg. 3554 (January 28, 1974); 45 Fed.Reg. 15179 (March 10, 1980); 53 Fed.Reg. 11280 (April 6, 1988); 53 Fed.Reg. 12528 (April 15, 1988)), but the labeling requirement has remained essentially the same. As currently codified, § 5.6.1 of the regulation (49 C.F.R. § 571.218) requires that "each helmet" be permanently and legibly labeled, "in a manner such that the label(s) can be read easily without removing padding or any other permanent part" with certain prescribed information, including "[t]he symbol DOT, constituting the manufac-

5. Those comments also indicate that the 1966 ANSI standard, adopted by MVA in 1973, had been revised in 1971 and 1973. The Z-90 Committee of ANSI joined other groups in petitioning for amendment of the Federal Standard. *See* 39 Fed.Reg. 3554 (January 28, 1974).

turer's certification that the helmet conforms to the applicable Federal motor vehicle safety standards."

At some point—when is not clear—MVA amended the 1972 regulation to make a number of largely stylistic changes, but, until 1992, the substance of the State regulation remained essentially the same.[6] The substantive and testing standards, at least facially, remained those set forth in the obsolete ANSI Standard Z90.1–1966, and helmets were presumably approved by MVA based on Confirmation Certificates issued by the American Association of Motor Vehicle Administrators.

With the adoption of the Transportation Article in 1977, as part of the ongoing code revision effort, former § 11–1306 of Article 66½ became § 21–1306 of the Transportation Article and assumed the format and the relevant language in the present law. In 1979, the General Assembly, by changing one word in § 21–1306, cut back significantly on the helmet requirement. It substituted the word "minor" for the word "person" and thereby imposed the requirement of wearing protective headgear meeting the standards established by the Administrator only upon operators or passengers who were minors. 1979 Md. Laws, ch. 746. No other change was made to the statute, thus leaving in place the 1970 requirement that MVA publish a list of approved helmets.

In 1992, the Legislature reversed its 1979 decision and again made § 21–1306(a) applicable to all individuals. 1992 Md. Laws, ch. 1. Although, as part of the Act, the Legislature added to the law a number of new provisions dealing principally with the effect of noncompliance, it left intact the existing provisions dealing with approval and publication.

The enactment of the 1992 statute prompted an evaluation by MVA of the existing regulation. A memorandum from MVA's Associate Administrator for Field Services to the Administrator noted, *some nineteen years after the fact,* that

---

6. In 1978, the MVA regulations were recodified in preparation for placement in COMAR, and in 1981, they were again recodified when actually placed in COMAR. *See* 5 Md. Reg. 227–29 (February 24, 1978); 8 Md. Reg. 1063 (June 12, 1981).

ANSI Specification Z90.1–1966 had been replaced by Federal Motor Vehicle Safety Standard (FMVSS) 218 and was no longer used. He recommended a number of changes in the MVA regulation to bring it into conformity with the Federal standard, among which were (1) amending the existing requirement that the Administrator approve (or disapprove) helmets to state that the Administrator "will identify the standards helmets must meet"; (2) deleting the requirement that the Administrator affix an approval label to approved helmets, as the Federal standard "already does this"; (3) deleting approval procedures, as "FMVSS 218 already establishes these standards and all manufacturers must comply if they want to sell their helmets in the United States"; and (4) deleting the authority of the Administrator to withdraw approval, for the same reason—"[t]his section is not necessary because [National Highway Traffic Safety Administration] already does this." Most significantly, for purposes of this case, the Associate Administrator indicated:

"The law, Section 21–1306,c,3, requires the Administrator to 'publish lists of all protective headgear . . . that he approves, by name and type. Changing the regulations to the FMVSS standards may eliminate the need to publish these lists because all helmets must have the DOT label affixed to them. These are the only helmets that may be sold in the United States."

Andrew Krajewski, the current MVA Division Director in charge of the Motorcycle Safety Program who worked on the revision of the regulation, testified in the circuit court that, once the MVA officials became aware of Federal Standard 218, they concluded that it was unnecessary for MVA to approve or disapprove specific helmets, as no helmet not in compliance with that Federal standard could be sold in the United States. He stated that MVA had attempted to compile a list of approved helmets but was unable to do so. Some manufacturers either never responded or responded inadequately to MVA's request for a list of approved helmets. Some helmets, he said, were not on any list but nonetheless complied with the Federal standard. MVA was concerned

about publishing an incomplete list and, in the end, opted not to publish any list but to suggest through education programs that buyers simply look for the DOT label, required by the Federal standard, before buying or using a helmet. Indeed, a brochure later published by MVA informs the public that "[h]elmets that meet the FMVSS No. 218 standard will have a permanent decal, containing the letters **D O T** (Department of Transportation)."

In conformance with those views, the regulation was amended, effective March 15, 1993. 20 Md. Reg. 515 (March 5, 1993); *see also* 19 Md. Reg. 2343–45 (December 23, 1992). The existing definition of "Protective helmet or headgear" was retained: "a device primarily intended to protect the upper part of the wearer's head against a blow or impact." The provision that no protective helmet be worn unless it is "of a type approved by the Administrator," was reworded to state that no such helmet could be worn unless it met "the standards established by the Administration." The regulation then adopted, by reference, FMVSS Standard 218 as "the minimum standards for helmets required to be worn by operators and passengers" in accordance with § 21–1306, citing 49 C.F.R. 571.218 (1991).[7] Section .02(C) of the regulation adopted as the test procedure for helmets or headgear the test procedures described in FMVSS 218. The existing provisions dealing with approval procedure—the application to the American Association of Motor Vehicle Administrators and a Confirmation Certificate of Approval issued by that Association— were deleted in favor of a provision that "[t]he Administration shall accept all helmets which comply with the requirements of FMVSS 218, Motorcycle Helmets 49 C.F.R. § 571.218 (1991)." That regulation, as amended in 1993, remains in effect.

---

**7.** Md.Code, § 7–207(a) of the State Government Article, prohibits CO-MAR from reprinting any text from the Code of Federal Regulations, without permission from the Joint Committee on Administrative, Executive, and Legislative Review. The record does not indicate whether MVA sought permission from that Committee to reprint the text of the Federal Regulation in lieu of adopting the standard by reference.

## DISCUSSION

### Appellee's Position and The Court's Ruling

MVA raises a number of procedural and substantive issues, which need to be viewed not only in the context of the declaratory ruling but also in light of appellee's challenge to the law and regulation. Distilling the allegations in appellee's pleading, as supplemented by the evidence presented in the circuit court, his complaint is essentially this: The statute (§ 21–1306) prohibits persons, on pain of a criminal conviction, from riding on a motorcycle unless they are wearing protective headgear that meets the standards established by the Administrator. The statute authorizes the Administrator to approve (or disapprove) particular headgear as well as to adopt and enforce regulations establishing standards for the approval of protective headgear, and it directs that the Administrator publish lists of headgear that he or she approves. The Administrator, through COMAR 11.13.05, has adopted FMVSS 218 as the standard for approval, a decision mandated by the preemption provision of Federal law (49 U.S.C. § 30103(b)). The Administrator has not chosen, however, to approve or disapprove any particular headgear or to publish a list of headgear that complies with FMVSS 218, and thus as well with COMAR 11.13.05 and § 21–1306. Instead, the regulation states that the Administration "shall accept all helmets which comply with the requirements of FMVSS 218...."

Appellee contends, and was able to establish in court, that neither he nor Mr. Krajewski could reliably determine, from merely reading FMVSS 218 and without conducting engineering tests beyond their ability to conduct, whether a particular helmet complies with that standard. Appellee's position is that FMVSS 218, as written, is a highly technical standard directed at manufacturers of protective headgear and is not intended to be applied, and cannot practicably be applied, by ordinary laypersons in deciding which helmets are acceptable and which are not. It is this dilemma, he urges, that makes the statute, coupled with the COMAR regulation, impermissibly vague and unenforceable. He offered other evidence

indicating that some helmets containing the DOT label do not, in fact, comply with FMVSS 218, and that a consumer cannot, therefore, rely on the existence of that label as an assurance that the helmet meets the requirements of the COMAR regulation. Unless MVA in some way determines which headgear is acceptable and publishes a list of that headgear, the law, in his view, is impermissibly vague and, as a result, effectively prohibits people from riding on motorcycles.

The circuit court essentially accepted that argument. It found "as an established evidentiary fact" that "merely because a motorcycle helmet bears the symbol 'DOT' does not mean that the helmet has actually passed the tests required by COMAR 11.13.05.02." It also concluded that, although MVA has adopted a standard, "[c]itizens of ordinary intelligence cannot know how to use FMVSS 218. People of ordinary intelligence cannot reasonably be expected to know what FMVSS 218 commands of them." The court concluded that the Legislature was likely aware of that difficulty and, for that reason, "*directed* the Administrator, using the expertise at his disposal, to publish a list of protective headgear which had passed the scientific standards of FMVSS 218." Because one cannot rely with assurance simply on the existence of a DOT label, the court concluded, in the end, that the Administrator must publish a list of approved headgear.

### *Standing*

MVA has a multiple response to appellee's complaint and the court's ruling on it. Relying on principles set forth in *Bowers v. State*, 283 Md. 115, 389 A.2d 341 (1978), it first launches an attack on appellee's standing to challenge the law on vagueness grounds. *Bowers* involved a void-for-vagueness attack on the Maryland child abuse statute. The defendant claimed that the statute was vague in two respects: it did not sufficiently define the phrase "cruel or inhumane treatment" or the phrase "temporary care or custody," both of which were elements of the offense. The 15–year old victim was the defendant's step-daughter who lived with him and her mother in the family home; the charge of abuse arose from the

defendant's hitting the child 15–20 times on the back, neck, arms, and legs with a belt.

In considering the argument framed by Bowers, we acknowledged, as the general standard, that a penal statute must "be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Id.* at 120, 389 A.2d at 345, quoting from *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926). Continuing our quotation from *Connally*, we noted that "a statute which either forbids or requires the doing of an act in terms so vague that men [or women] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." In ascertaining whether a statute runs afoul of that principle, we held that two criteria are typically considered, the first of which we characterized as the "fair notice" principle: that "persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly." *Bowers, supra,* 283 Md. at 121, 389 A.2d at 345.

The point seized upon by MVA was our further statement that, unless the statute appears to intrude upon fundamental constitutional liberties, the void-for-vagueness attack must ordinarily be determined "strictly on the basis of the statute's application to the particular facts at hand." *Id.* at 122, 389 A.2d at 346. In that setting, "it will usually be immaterial that the statute is of questionable applicability in foreseeable marginal situations, if a contested provision clearly applies to the conduct of the defendant in a specific case." *Id.* In the *Bowers* case, we did not apply that standard but instead applied the stricter standard applicable to statutes intruding upon fundamental constitutional rights, nonetheless sustaining the law under that standard.

MVA urges that "[a] motorcycle rider has no protected liberty interest in operating a motorcycle without a helmet on the public highways" and that, "[a]s no fundamental liberty interest is involved in regulating motorcycle helmet use, a

motorcycle rider may not assert a facial challenge to a helmet law." To put the argument in perspective, it is important to keep in mind that the facial challenge being mounted by appellee is not to the substance of the law—that a helmet requirement is substantively invalid—but only to whether the law, coupled with the regulation, is sufficiently clear and certain to allow him to comply with the requirement.[8] His point, as noted, is that, the law and the COMAR regulation, as written, do not permit him to comply with the requirement.

MVA's standing argument arises from the assertion in appellee's complaint that he operates a motorcycle "without a helmet." In testimony, he said that, although he owns a number of helmets, he occasionally wears soft-fabric head coverings of various kinds—a fleece-lined Santa Claus hat, a bandanna, and baseball and welder's caps—that he regards as protective headgear but that MVA does not. From this, MVA urges that, as appellee has made no attempt to wear anything that might conceivably fall within the ambit of FMVSS 218, the issue of whether the law and regulation are impermissibly vague was not before the court. If, indeed, appellee consistently wore no headgear at all or nothing more substantial than a bandanna, MVA's argument might well have merit. *See Commonwealth v. Guest,* 12 Mass.App.Ct. 941, 425 N.E.2d 779 (1981). MVA's assertion takes no account of other evidence before the court, however. It is important to recall that under the COMAR definition, a "protective helmet or headgear" includes any device "primarily intended to protect the upper part of the wearer's head against a blow or impact." Gone is the former (1968) statutory requirement that the protective headgear be "firm and durable." The current definition, while it probably would not include a bandanna,

---

**8.** The lack of a substantive attack on the law may be a recognition that such facial challenges have almost uniformly been rejected by State and Federal courts throughout the country. *See Simon v. Sargent,* 346 F.Supp. 277, *aff'd per curiam,* 409 U.S. 1020, 93 S.Ct. 463, 34 L.Ed.2d 312 (1972); *Benning v. State,* 161 Vt. 472, 641 A.2d 757 (1994), and cases cited therein; *see also Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486 (9th Cir.1996).

does not necessarily rule out all soft-fabric headgear; the question is whether FMVSS 218 does. Appellee testified that he had, indeed, made significant efforts to determine what kinds of headgear were acceptable and what kinds were not. He obtained a copy of FMVSS 218 from the U.S. Department of Transportation, read it, and asked for assistance in interpreting the law from MVA, the State's Attorney for St. Mary's County, and a "motorcycle rights organization." He visited the National Highway Traffic Safety Administration library in Washington and examined test reports on various helmets; he paid $54 to obtain copies of those test reports, some of which he placed into evidence. He urged in his testimony that "I have gone well-beyond attempting to comply with this law. I think I have put an exorbitant effort into doing that." The circuit court accepted that and, for purposes of this appeal, so shall we. He has in the past faced and he will continue to face criminal charges based on his disagreement over the meaning and requirement of the COMAR regulation.

### *Substance*

The issue then is whether the law and regulation, read together, really do suffice. As MVA points out, vagueness arguments of the kind asserted by appellee have been made in a number of cases, usually, but not always, without success. *See Benning v. State, supra,* 641 A.2d 757; *Kingery v. Chapple,* 504 P.2d 831 (Alaska 1972); *State v. Eitel,* 227 So.2d 489 (Fla.1969); *Hamm v. State,* 387 So.2d 946 (Fla.1980); *State v. Lee,* 51 Haw. 516, 465 P.2d 573 (1970); *State v. Albertson,* 93 Idaho 640, 470 P.2d 300 (1970); *City of Albuquerque v. Jones,* 87 N.M. 486, 535 P.2d 1337 (1975); *Ex Parte Smith,* 441 S.W.2d 544 (Tex.Cr.App.1969); *Buhl v. Hannigan,* 16 Cal. App.4th 1612, 20 Cal.Rptr.2d 740 (Cal.Ct.App.1993); *Bianco v. California Highway Patrol,* 24 Cal.App.4th 1113, 29 Cal. Rptr.2d 711 (Cal.Ct.App.1994); *Easyriders Freedom F.I.G.H.T. v. Hannigan, supra,* 92 F.3d 1486; *compare State v. Maxwell,* 74 Wash.App. 688, 878 P.2d 1220 (1994).

In each of those cases, the court looked to see if, indeed, there was a practical way for citizens to ascertain which

helmets were lawful for use. In *Benning,* for example, the court pointed out that it was reluctant to strike down a safety law on vagueness grounds "with no showing that affected parties *on request* cannot obtain guidance on how to comply." 641 A.2d at 763. In that regard, it noted that "[t]he easiest method is labelling," but that "[i]f labelling does not provide a certain result," motorcyclists could consult the American Association of Motor Vehicle Administrators list, a copy of which was maintained by the Vermont MVA. *Id.* 641 A.2d at 764. As noted in *Ex Parte Smith,* the Texas law required the Department of Public Safety to compile a list naming each style and make of protective headgear approved and to make that list available to the public. 441 S.W.2d at 548. In *Buhl* and *Bianco,* the California courts essentially construed the State law as allowing any helmet containing the DOT label, unless the person had actual knowledge that the helmet was not in compliance with the Federal standard. 16 Cal.App.4th at 1622, 20 Cal.Rptr.2d 740, 24 Cal.App.4th at 1123, 29 Cal. Rptr.2d 711. The attack in *Kingery* seemed to be on the inability to obtain the Federal standard, adopted by reference, rather than on whether the standard was understandable, and the court merely held that, "[i]n the abstract posture of this suit, we do not find a violation of due process resulting from inability to ascertain the standard adopted by reference." 504 P.2d at 837.

The fundamental flaw in appellee's argument and the circuit court's acceptance of it lies in the supposition that, absent publication of a list by MVA, there is no practical way for citizens to know which helmets are acceptable and which are not. That is simply not the case. Unfortunately, that supposition, though incorrect, is not an unreasonable one in light of MVA's insistence that consumers may rely with total assurance on the DOT label, for that, too, is apparently not the case.

As has been pointed out by a number of courts, the regulatory scheme embodied in the 1966 Federal legislation and the safety standards adopted pursuant to it is, to a large extent, based on self-certification by manufacturers that their prod-

ucts conform to the applicable standards. *Juvenile Products Mfrs. Ass'n, Inc. v. Edmisten,* 568 F.Supp. 714 (E.D.N.C. 1983); *Bianco v. California Highway Patrol, supra,* 24 Cal. App.4th at 1121, 29 Cal.Rptr.2d 711. The protective headgear standard is, indeed, very technical, both in terms of substantive requirements and testing procedures. It does not and could not envision consumers having to make individual judgments, based solely on a reading of the standard, as to whether a particular device conforms, and that, obviously, is why both the Federal law and the standard contain specific certification and labeling requirements. Unfortunately, whatever may have been DOT's or MVA's intent in that regard, the evidence clearly shows that not all helmets bearing the DOT label in fact comply with FMVSS 218. DOT's own brochure makes that clear. To the extent that MVA reads its COMAR regulation as allowing any helmet containing a DOT label, it misreads its own regulation and thus the statutory requirement. The regulation does not even purport to approve any helmet containing the DOT label. It plainly requires that a helmet "comply with the requirements of FMVSS 218," of which the label is only a part.

The reason why the court erred is because, apart from the label, there is a practical way for consumers to determine whether a helmet complies with the Federal standard. An easily readable brochure published by the Federal Department of Transportation provides a usable list.

The Federal law permits the Department of Transportation to conduct its own tests on headgear containing the DOT label, and, if a device is shown not to be in compliance with the standard, the Department may require the manufacturer to take steps to remedy the noncompliance. *See* 49 U.S.C. §§ 30118–30120. At some point in 1994, the Federal Department of Transportation published a brochure on motorcycle helmets, a copy of which appellee obtained and placed into evidence. DOES YOUR HELMET PASS THE TEST: A SAFETY GUIDE, U.S. DEPARTMENT OF TRANSPORTATION (1994). In that brochure, the Department noted that manufacturers are required to certify that their helmets meet or exceed the requirements of

FMVSS 218 but also pointed out that "some helmets carry the DOT label even though they do not meet those requirements." The brochure continues, however, that, in 1994, the National Highway Traffic Safety Administration had tested "all known helmets available in the marketplace" and it then lists, by brand and model, each helmet tested and how it performed.[9] The brochure recites:

> "This brochure lists motorcycle helmets tested in 1994 by NHTSA. Each helmet listed was tested to verify that it meets the minimum performance levels specified in the standard. These performance requirements ensure that the helmet will provide a minimum level of head impact protection and chin strap retention capability. Helmets are listed by brand and model name, and whether the helmet satisfied impact, penetration, and retention performance requirements. In cases of apparent performance failures, investigations will be conducted to determine if corrective action such as a recall is necessary."

Appellee takes issue with DOT's assessment of which helmets have passed the requisite tests. He contends that, to comply with the requirements of FMVSS 218, a helmet must pass four tests—"Hot, cold, ambient, and submerged conditions"—and that, according to the DOT brochure, only 24 of the 156 helmets passed all four tests. Appellee misreads the text and requirements of the standard.

Section 5 of the standard requires that a helmet "meet the requirements of § 5.1, § 5.2, and § 5.3 when subjected to any conditioning procedure specified in § 6.4, and tested in accordance with § 7.1, § 7.2, and § 7.3." Section 5.1 provides for an "impact attenuation" test, which, according to the brochure, measures "[t]he helmet's ability to protect the motorcyclist's head in the event of a crash by absorbing the impact with the

---

**9.** In his brief, appellee notes that the 156 helmets tested by NHTSA were those "currently available on the market" and that there may be as many as 1,000 other helmets that could be worn. We note that the DOT brochure contains a toll-free "Auto Safety Hotline" number that consumers can call "[f]or more information."

inner liner." That test is to be conducted in accordance with the requirements of § 7.1. Section 5.2 provides for a "penetration" test, designed to determine "[t]he helmet's ability to protect the motorcyclist's head from the intrusion of sharp objects which might be encountered in a crash." That test is to be conducted in accordance with the requirements of § 7.2. Section 5.3 requires a test of the "retention system," i.e., "[t]he chin strap's ability to keep the helmet on the wearer's head in a crash." That test must be conducted in accordance with § 7.3. *Those* are the three tests required by FMVSS 218. What appellee refers to as "tests" are not tests at all but rather four alternative conditions under which the three tests may be conducted; a helmet need not be tested under all four conditions. Section 6.4.1, which is part of the pre-testing procedure requirements—the "conditioning procedure" referred to in § 5—states:

"Immediately before conducting the testing sequence specified in § 7, condition each test helmet in accordance with *any one* of the following procedures:

(a) *Ambient conditions.* Expose to a temperature of 70°F (21°C) and a relative humidity of 50 percent for 12 hours.

(b) *Low temperature.* Expose to a temperature of 14°F (–10° C) for 12 hours.

(c) *High temperature.* Expose to a temperature of 122°F (50°C) for 12 hours.

(d) *Water immersion.* Immerse in water at a temperature of 77°F (25°C) for 12 hours."

(Emphasis in text added.)

The suggestion that a helmet not subjected to testing under all four conditions fails to comply with FMVSS 218 appears wholly unwarranted. The DOT brochure challenged by appellee does *not* indicate that only 24 helmets listed as "PASS" comply with the standards. It shows, rather, that 142 of the 156 helmets passed under one or more of the four conditions, and it lists those helmets by brand and model. It also lists, by

brand and model, the 14 helmets that did not pass, and it even identifies which of the three tests the helmet failed.

■ The relevant considerations in this case are as follows. The Federal preemption provision (§ 30103(b)) requires the State to adopt FMVSS 218 without any deviation. MVA has done so. The thrust of the Federal law is to allow consumers to rely on the DOT label placed on or accompanying protective headgear, and, in most instances, that appears to be a practical approach. Over 90% of the helmets tested by NHTSA passed the three requisite tests. There is no indication that State or local police authorities ever have or ever would cite or prosecute a motorcycle operator or passenger wearing a helmet that contains the required DOT label, unless, perhaps, as in the *Bianco* situation (*Bianco v. California Highway Patrol, supra,* 24 Cal.App.4th 1113, 29 Cal.Rptr.2d 711), it is evident that (1) the helmet does not comply, *and* (2) the person wearing the helmet has actual knowledge of the noncompliance. If a motorcyclist is unwilling to risk wearing a helmet based solely on the DOT label, he or she may consult the DOT brochure, which appears to be readily available, or, as to a helmet not "available on the market," call the "hotline" stated in the brochure. The brochure informs the person which helmets "available on the market" conform and which do not. In this light, there is nothing impermissibly vague about the Maryland law or regulation. There is nothing to guess at.

■ In his brief, appellee makes the additional point that the Administrator, through the COMAR regulation accepting helmets complying with FMVSS 218, has, in effect, approved those helmets and therefore has a statutory duty to publish a list of them. Assuming that that claim was presented by appellee's complaint, which is not at all certain, we find no merit in it. Although it may be implicit from the COMAR regulation that any helmet tested by NHTSA and found to be in compliance with FMVSS 218 would satisfy the COMAR regulation, there is no indication that the Administrator has formally "approved" any particular kinds of helmets, and the

statute requires publication only of the helmets that are so approved.

JUDGMENT REVERSED; CASE REMANDED FOR ENTRY OF DECLARATORY JUDGMENT IN CONFORMANCE WITH THIS OPINION; APPELLEE TO PAY THE COSTS.